## NATIONAL LABOR RELATIONS BOARD v. NATIONAL MARITIME UNION OF AMERICA et al.

No. 189, Docket 21099.

United States Court of Appeals
Second Circuit.

July 1, 1949.

---

Robert N. Denham, David P. Findling,
A. Norman Somers and Fannie M. Boyls,
Washington, D. C., for petitioner.

William Standard, Herman Rosenfeld, Herman E. Cooper, New York City (H. Howard Ostren, New York City, of counsel), for respondent.

Before L. HAND, Chief Judge, and CLARK and FRANK, Circuit Judges.

FRANK, Circuit Judge.

1. Respondents contend that the Board violated the Administrative Procedure Act, 5 U.S.C.A. §§ 1001–1011, in this respect: The Board's complaint issued on June 2, 1948. At the opening of the hearing before the Trial Examiner on June 14, respondents requested an adjournment on the ground that they and their counsel were engaged in court, and in other administrative hearings, relative to the very same matters. This request was refused. Respondents then withdrew from the hearing which continued on June 14, 15 and 16. After the issuance of the Trial Examiner's Intermediate Report, respondents on July 2 filed a motion before the Board requesting that the hearing be reopened to give them an opportunity to present their case, or, in the alternative, that the Board incorporate as part of the record in this case the evidence to be introduced by the respondents in another proceeding, then scheduled to be heard at New York before a Trial Examiner of the Board on July 12, which, the respondents stated, involved issues identical with those in the instant proceeding. The Board denied this motion. Subsequently, at the oral argument before the Board, counsel for respondents stated that he did not want the case reopened or any further hearing held because of the Trial Examiner's failure to grant an adjournment, and that he was requesting only that the Board incorporate as a part of the record the evidence regarding the hiring hall which respondents were introducing in another case then being heard in New York. The Board granted this request, and all evidence which respondents assert they would have presented at the hearing in this case, had they not walked out, was incorporated as a part of the record in this case. In these circumstances, at least, there is no merit to respondents' procedural objections.

2. Most of the other contentions made by respondents in this court were considered and satisfactorily answered in the Board's Decision.[1] There is no need to discuss the Board's answers in detail. Suffice it to say that the Board did not hold violative of the Act the mere hiring-hall provisions of the agreement which respondents demanded of the employers. In its decision, the Board said: "The hiring-hall provision in question does not on its face require that the Companies discriminate in favor of NMU members. Unlike the so-called 'closed-shop' contract, by virtue of which employers are required to hire only such persons as are members of the contracting union, this provision requires only that the employer hire such persons as are supplied by the Union unless the Union is unable to provide the needed replacements. It is thus contended by the Respondents that there is nothing on the face of the agreement which contemplates a discrimination in violation of Section 8(a)(3), 29 U.S.C.A. § 158(a)(3). We do not pass upon whether the hiring-hall provision would be unlawful absent evidence that in supplying the Companies with personnel, NMU discriminated against non-members. The record establishes, and we find, that in the operation of the hiring-halls in question, such discrimination against non-members did exist, and that the Respondents and the Companies contemplated that such discrimination would continue if the hiring-hall provision was included in the 1948 agreement. * * * Beyond the peradventure of doubt, the hiring-hall in practice has involved discrimination in the hire and tenure of employment of unlicensed seamen to encourage membership in NMU. It is a discrimination which has been initiated by NMU, and acquiesced in by the Companies. Moreover, it is clear from the record in this case that what NMU was demanding in its negotiations, and in its strike, was not merely a continuation of the form of the hiring-hall clause in its agreements with the Companies, but a continuation of the practice outlined above, by which preference in job assignment and job retention was given to NMU members. * * * In disposing of this contention, it is not neces-

---

[1] Those not considered by the Board we discuss below, in points 5 and 6 of this opinion.

sary for us to determine whether an employer would violate Section 8(a) (3) by the mere act of executing a contract containing the hiring-hall clause, the performance of which we have found would, under the conditions here present, violate this provision of the Act. As noted above, the Respondents' bargaining demands and strike were calculated to cause the Companies not merely to agree to continuation of the hiring-hall clause as such, but also to continue to cooperate in the practices flowing from execution of this clause, as a result of which NMU members were given preference in employment over non-members. Moreover, Section 8(b) (2) proscribes not only those acts by which a labor organization or its agents actually cause an employer to discriminate unlawfully against employees, but also those acts by which it attempts to cause such discrimination. In our view, the prohibition is not confined to those instances in which specific non-union employees are unlawfully discriminated against. It extends as well to instances in which the union, or its agents, seeks to cause the employer to accept conditions under which any non-union employee or job applicant will be unlawfully discriminated against. The acts of the Respondents in the instant case fall squarely within this prohibition." [2]

3. There is ample record evidence to support the Board's findings of fact. And the statute, in the light of its clear legislative history relative to hiring-halls, justifies the Board's legal conclusions.[3] Like the Board, we see no rational basis for respondents' argument that Section 8(b) (2) does not make it an "unfair labor practice" to attempt to cause an employer to discriminate against a group of employees or potential employees but only against some specified employees or potential employees.

4. In its Decision, the Board said: "We are asked by the Respondents to consider the economic facts which gave rise to the hiring hall in the maritime industry and which, in the view of the Respondents, require its continuance in the future. It is said that the peculiar characteristics of maritime employment require that a union control and regulate the supply of labor in order to avoid the graft, favoritism, and indignities which in past years have attended job-seeking in this industry. It is also said that the Respondents' hiring halls have made possible a fair rotation of jobs, and an even supply of labor, in the best interests of seamen and shipowners alike. Insofar as such factors touch upon the wisdom of legislation which renders the NMU hiring halls unlawful, they, of course, raise considerations which can have no bearing on our determination of the issue before this Board. The full facts concerning the reasons for and operation of maritime hiring halls were brought to the attention of the Congress prior to the enactment of the amended Act. The Congress determined that the public interest required that hiring-

---

[2] The employers, in negotiations with the union, were willing to agree "to go along on some form of agreement whereby the Union would register both union and non-union members and send the operators a list of them so that they could sort of police the thing and see that no discrimination took place." The union representatives, however, insisted that preference should be given to their own members whenever placements were needed.

[3] Senator Taft, Chairman of the Senate Committee and one of the principal sponsors of the statutory amendments, speaking of what he described as the evils of closed-shop arrangements, said on the Senate floor: "Perhaps that is best exemplified by the so-called hiring halls on the west coast where shipowners cannot employ anyone unless the union sends him to them. That has produced a situation, certainly on the ships going to Alaska, as the testimony before our Committee showed clearly, where there is no discipline. A man may be discharged one day and may be hired the next day, either for the same ship or for another ship. Such an arrangement gives the union tremendous power over the employees; furthermore, it abolishes a free labor market. A man cannot get a job where he wants to get it. He has to go to the union first; and if the union says that he cannot get in, then he is out of that particular labor field. Under such circumstances there is no freedom of exchange in the labor market, but all labor opportunities are frozen." See Cong. Rec., Senate, April 23, 1947, p. 3952.

halls involving discrimination against employees who are not union members be outlawed. This determination is binding upon us. It is our duty to administer the law as written, not to pass upon the wisdom of its provisions."

██ We, too, take that position. Sometimes, to be sure, the nature of a statute is such that impliedly it delegates to the courts, in interpreting it, the power and duty to round out the legislative legislation by judicial legislation[4] which involves considerations of social policy.[5] But where, as here, the legislature's purpose is plain, there is no room for such judicial "law-making." Wherefore (passing for the moment the question of constitutionality) we must give effect to that purpose, without regard to our own beliefs, no matter how strong they may happen to be, as to the social undesirability of the resultant return to the so-called shape-up in the employment of seamen.[6] Otherwise we would be setting ourselves up, unlawfully, as a super-Congress.[7]

██ 5. As a result of negotiations, respondents entered into new bargaining agreements with the several employing companies on June 21, October 16, October 21, and November 1, 1948. We think those

---

[4] That, perforce, at times, the legislature impliedly delegates to the courts that sort of "sub-legislation" in connection with statutory interpretation, see, e. g., L. Hand, J., in United States v. Associated Press, D.C., 52 F.Supp. 362, 370; Frank, Words and Music, 47 Col.L. Rev. (1947) 1259, 1266, 1269–1272.

That delegated power is sometimes immense, and it is capable of abuse. Its wide scope and the possibility of abusing it have long been observed. Before Bishop Hoadly in 1717 had made his much-quoted remark ("Whoever hath an absolute authority to interpret * * * any laws, it is He who is truly the Law Giver * * *"), Halifax in 1684 had said: "And as rivers do belong as much to the channel where they run as to the spring from whence they first arise, so the laws depend as much upon the pipes through which they are to pass as upon the fountain from whence they flow. * * * If the King had the sole power of choosing physicians, men would tremble to see bunglers preferred; and yet the necessity of taking physic from a doctor is generally not as great as receiving justice from a judge." Halifax, The Character of a Trimmer (1684), reprinted in Foxcroft, Life and Letters of Halifax (1898) II, 280, 285, 286.

Earlier, in 1651, Hobbes had more pointedly said: "By the craft of an Interpreter, the Law may be made to bear a sense, contrary to that of the Sovereign; by which means the Interpreter becomes the Legislator." Hobbes, Leviathan (Cambridge ed. 1904) 197.

Still earlier, in the latter part of the 16th century, it was said in a Treatise Concerning Statutes (sometimes ascribed to Sir Christopher Hatton): "For the Sages of the Law whose wits are exercised in such matters, have the interpretation in their hands, and their Authority no man taketh in hand to control; where-fore their Power is very great, and high, and we seek these Interpretations as Oracles from their mouthes." See Thorne, A Discourse Upon the Statutes (1942) 64 n. 134.

According to Coke, James I was angered when Coke, in 1608, called attention to such judicial power; 12 Coke Rep. 63. As to doubts about the accuracy of Coke's report (written many years after 1608), see Usher, The Rise and Fall of the High Commission (1913) 189–190; Usher, Reconstruction of the English Church (1910) II, 213–216; Usher, 18 Eng.Hist.Rev. (1903) 664, 669; McIlwain, The High Court of Parliament (1910) 77; Holdsworth, History of English Law, V (1924) 430–431; Frank, If Men Were Angels (1942) 225.

For statements by numerous Supreme Court Justices as to the unavoidability of some judicial legislation, see New England Coal & Coke Co. v. Rutland, 2 Cir., 143 F.2d 179, 189, note 31.

[5] See, e. g., Mr. Justice Jackson in State Tax Commission of Utah v. Aldrich, 316 U.S. 174, at page 202, note 23, 62 S.Ct. 1008, 86 L.Ed. 1358, 139 A.L. R. 1436, referring to the Swiss Code; Cardozo, The Nature of the Judicial Process (1921) 135, 140; Usatorre v. The Victoria, 2 Cir., 172 F.2d 434, 439–441 and notes.

[6] See, e. g., Report of the Maritime Labor Board to the President and to the Congress (1940).

[7] See Frank, Words and Music, 47 Col. L.Rev. (1947) 1259, 1271: "A judge * * * who publicly admits that at times he cannot help legislating, is far more demanding of himself, far more restrained when doing so. Such a judge will do his best to enforce the policy of a statute, even when he detests its aim. If he is a so-called conservative, he will not deliberately try to frustrate a distastefully liberal statute, if he is a so-

agreements do not call for non-enforcement of the Board's order of August 17, 1948. True, the new agreements with three of the companies modify the hiring-hall provisions of the 1947 agreements by permitting non-union seamen in the employ of those companies at the time of the execution of the new agreements to remain in such companies' employ, and by permitting the companies at the beginning of a new shipping season to recall such non-union men, who may be in their employ at the end of the previous shipping season. But these new agreements provide that, in other respects, the "employment practices"—i. e., the hiring-hall practices requiring the companies to give preference to union members in hiring applicants—shall be continued until the expiration date of the new agreements or until such practices shall "receive final judicial determination." 8

■ 6. Respondents contend that the pertinent provisions of the Act, so far as they apply to the facts here found, violate the First, Fifth and Thirteenth Amendments to the Constitution.9 In carefully considering those contentions, we have had in mind that the unusual power of the American judiciary to veto judicially, as unconstitutional, a Congressional enactment 10 should be exercised by an intermediate appeal court with an especially watchful eye on the decisions of the Supreme Court, because, peculiarly in respect of constitutionality, the highest court in the land has the ultimate responsibility. Chief Justice Hughes taught that unavoidably in our governmental system the Constitution (except as to "political" questions) "is what the [Supreme Court] judges say it is." 11 The Constitution has thus become a sort of palimpsest; and, if some of the overlay consisting of that Court's gloss may at times be removed,12 an inferior court like ours is not the one to do it. Our humbler function (not always an easy one) 13 is to interpret the highest court's interpretations, to follow cautiously but intelligently its current "doctrinal trends." 14

called liberal, he will deal similarly with what he considers perniciously reactionary legislation."

See also L. Hand, in How Far Is A Judge Free in Rendering a Decision? in Law Series I, Lecture No. 14, National Advisory Council on Radio in Education (1933), quoted in part in Usatorre v. The Victoria, 2 Cir., 172 F.2d 434, 442–443, note 16.

8 Respondents seem to argue that, because their new agreement with The Texas Company recites that the parties withdrew "any and all notices and/or proposals" concerning their agreement dated August 21, 1947, and provided that the 1947 contract should continue in force until June 15, 1950, that agreement is permissible under the amended Act. We cannot agree. For, even if the 1947 agreement had not terminated, as it did, on January 19, 1948, the hiring-hall provision of that agreement could not have been lawful beyond August 21, 1948, the end of one year from the date of execution of that agreement. The amended Act, in dealing with the effective date of certain changes in the Act, permits preferential hiring agreements made between the enactment and the effective date of the amended Act to remain in force until their termination date or one year from the date of such agreements, whichever is the shorter period. Consequently, the hiring-hall provision of the 1947 agree-

ment was in fact unlawful after January 19, 1948, and the agreement could not have been drawn so as to make it lawful after August 21, 1948.

9 Respondents argue that the statute, as here construed, violates the First and Fifth Amendments by destroying the right of self-organization," and that it also runs foul of the Fifth Amendment because there is no reasonable relation between the purpose of the statute (to free interstate commerce from interruption by labor disputes) and denial to organized seamen of the right of bargaining for their previous hiring-hall practices. Respondents urge that the statute violates the Thirteenth Amendment by imposing "involuntary servitude."

10 See Clark, The Dilemma of America Judges, 35 Amer. Bar Ass'n, J. (1949) 8.

11 Hughes, Speech before the Elmira Chamber of Commerce, May 3, 1907, reprinted in Hughes, Addresses, 1906–1916, 179, at 185.

12 Mr. Justice Douglas, Stare Decisis, 49 Col.L.Rev. (1949) 736.

13 "It is more of a business to interpret the interpretations than to interpret the things. * * *" Montaigne, Essays, Book III, Ch. 13.

14 See Perkins v. Endicott-Johnson Corporation, 2 Cir., 128 F.2d 208, 217–218; Picard v. United Aircraft Corp., 2 Cir., 128 F.2d 632, 633, 636; Choate

■ With all that in mind, we have concluded that respondents' contentions resting on the First and Fifth Amendments are met by decisions of the Supreme Court in passing on the National Labor Relations Act before its amendment and on other federal legislation,[15] together with its very recent decisions concerning the validity of state labor legislation.[16]

■ We think that, under Supreme Court decisions, the "involuntary servitude" provision of the Thirteenth Amendment is inapplicable here. For the Board's order does not expressly forbid employees to leave their jobs, individually or in concert.[17] It is directed only against the Union and its agents. It provides: "1. National Maritime Union of America, affiliated with the Congress of Industrial Organizations, and its officers, representatives and agents, shall: (a) Cease and desist from: * * * (3) Directing, instigating, or encouraging employees to engage in a strike, or approving or ratifying strike action taken by employees, for the purpose of requiring that the Companies execute contracts which expressly, or in their performance, make membership in NMU a condition of employment, except in accordance with the provisos in Section 8(a) (3) of the Act." The Board's brief does not interpret the order more broadly than that: "The Board's order is directed only against the NMU and its agents and does not prohibit any employee or group of employees from quitting their (sic) jobs or refusing to work even to accomplish an unlawful object." Thus interpreted, we think the order does not impose "involuntary servitude" on anyone within the meaning of the Thirteenth Amendment. We have not overlooked Mr. Justice Rutledge's caveat [18] that this question may perhaps still be open; but our reading of the Supreme Court's decisions leads us to believe that that Court will answer it as we have done.

If our interpretation of the Supreme Court's interpretation of the Constitution is sound, then, respondents, who deem the statute harmful, must pursue the constitutional, democratic, process of either persuading the present Congress or electing new Senators and Congressmen who agree with them. In a democracy, "men should not think it slavery to live according to the rule of the Constitution; for it is their salvation." [19]

v. Commissioner, 2 Cir., 129 F.2d 684, 686; Frank, Words and Music, 47 Col. L.Rev. (1949) at 1271.

[15] See, e. g., N. L. R. B. v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S. Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; United States v. Petrillo, 332 U.S. 1, 67 S.Ct. 1538, 91 L.Ed. 1877; International Association of Machinists, etc., v. N. L. R. B., 311 U.S. 72, 61 S.Ct. 83, 85 L. Ed. 50; N. L. R. B. v. Virginia Electric & Power Co., 314 U.S. 469, 62 S.Ct. 344, 86 L.Ed. 348; N. L. R. B. v. Electric Vaccum Cleaner Co., 315 U.S. 685, 62 S.Ct. 846, 86 L.Ed. 1120; Shields v. Utah-Idaho R. Co., 305 U.S. 177, 59 S. Ct. 160, 83 L.Ed. 111; United States v. Darby, 312 U.S. 100, 657, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430; Virginia Railway Co. v. System Federation No. 40, 300 U.S. 515, 57 S.Ct. 592, 81 L. Ed. 789; United States v. Carolene Products Co., 304 U.S. 144, 154, 58 S.Ct. 778, 82 L.Ed. 1234.

[16] Lincoln Federal Labor Union v. Northwestern Iron & Metal Co., 335 U.S. 525, 69 S.Ct. 251; A. F. of L. v. American Sash & Door Co., 335 U.S. 538, 69 S.Ct. 258.

[17] See Pollock v. Williams, 322 U.S. 4, 17–18, 64 S.Ct. 792, 88 L.Ed. 1095; United States v. Petrillo, 332 U.S. 1, 12–13, 67 S.Ct. 1538, 91 L.Ed. 1877; Arthur v. Oakes, 7 Cir., 63 F. 310, 318–320, 25 L.R.A. 414.

[18] A. F. of L. v. American Sash & Door Co., 335 U.S. 538, 557, 558, 69 S. Ct. 258.

[19] Aristotle, Politics, Bk. V, Ch. 9, 1310a, 35.