## NATIONAL LABOR RELATIONS BOARD

v.

## GOTTFRIED BAKING CO., Inc. et al.

### No. 151, Docket 22829.

United States Court of Appeals
Second Circuit.

Argued Jan. 12, 1954.

Decided Feb. 15, 1954.

As Modified on Petition for Rehearing
May 17, 1954.

George J. Bott, David P. Findling, A. Norman Somers, Fannie M. Boyls and Thomas F. Maher, Washington, D. C., for petitioner.

Smith & Rafsky, New York City, Murray Rafsky, New York City, of counsel, for R. K. Baking Corp.

Samuel J. Cohen, New York City, Henry Weiss, New York City, of counsel, for Bakery and Pastry Drivers and Helpers Union, Local No. 802, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL.

Before FRANK, MEDINA and HINCKS, Circuit Judges.

MEDINA, Circuit Judge.

This case arose out of charges filed by one Max Winzelberg, a bakery route driver, against (1) Bakery and Pastry Drivers and Helpers Union, Local No. 802, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL, hereinafter referred to as the "Union," of which he was a member; (2) Gottfried Baking Co., Inc., hereinafter referred to as "Gottfried," his former employer; and (3) R. K. Baking Corp., hereinafter referred to as "R. K.", another bakery company. The three cases were consolidated for the purposes of hearing. The National Labor Relations Board substantially adopted the findings, conclusions and recommendations of the trial examiner as set forth in the intermediate report. The Board's decision and order are reported in 103 N.L.R.B. No. 3.

Gottfried is a New York corporation with its office and plants in New York City. It is engaged in the manufacture, sale and distribution of baked products. During the course of its operations it makes substantial purchases and sales outside the State of New York.

R. K. is a New York corporation with its principal office and plant in New York City. It is engaged in the manufacture, sale and distribution of pastry, cakes and other baked products. During the year 1951, shipments to R. K. from or through states other than the State of New York amounted to $86,038.13. During the same period, goods originating outside the State of New York, but delivered to R. K. out of stock held in the State of New York, amounted to $237,477.21. R. K.'s finished products were sold locally to numerous businesses and organizations concededly engaged in interstate commerce.[1]

R. K. has negotiated a collective bargaining contract with the Union as a member of an employer association created for that purpose, whose membership included baking companies which individually sold and transported annually to out-of-state purchasers goods valued in excess of $100,000.[2] The facts relating to the formation and operation of this association are as follows:

Sometime in May 1948, several employers negotiating collective contracts with the Union joined together under the leadership of one Morris Gertner, a flour merchant with whom they all had business dealings. Their express purpose was to advise and consult among themselves respecting the negotiations with the Union, and to establish, both among themselves and in their common negotiations with the Union, a unity of action in arriving at identical contracts which each would sign with the Union. Prior to the forming of this organization, known as the Cake Bakers' Association, the individual employers had already commenced negotiations with the Union, but they had no understanding among themselves that they would stand together, or that anyone might act as spokesman for the others. Upon its formation, however, the Association elected officers, including the president of R. K., who was elected vice-president, to speak in the Association's behalf, and it retained an attorney to represent it at the bargaining conferences. Each member company was assessed a proportionate amount to defray attorney's fees and incidental expenses, and was likewise required to post security in the amount of $5,000. to guarantee its compliance with the negotiation poli-

1. R. K. made no sales or deliveries outside the State of New York, except a sale and delivery of used barrels to a dealer in New Jersey in the amount of $1,042., and the sale and delivery of baked goods in the amount of $441.37 to a wholesaler engaged in interstate business. However, R. K. did sell and deliver baked goods in the amount of $26,474.29 to 16 employee cafeterias of industries and business organizations found to be engaged primarily in interstate commerce.

2. The other association members and their annual out-of-state sales were: John Reber Pastry Co., $550,000; Danilow Baking Co., $300,000; Wheatality Baking Co., $250,000; Berke Baking Co., $250,000; and Your Baking Co., $150,000.

cies and eventual contract provisions arrived at with the approval of at least two-thirds of the membership. Despite the Union's reluctance to deal with the employers through the Association or through the Association's attorney and a brief strike called to enforce these objections, the Union and the Association executed an agreement on July 15, 1948. The document specifically identified the Association as a party to the contract and was signed by the Association's officers as well as by the representatives of the individual companies.

The negotiations conducted in 1950 followed the same pattern as those carried on in 1948, except that the Association was not represented by counsel, and there was no express understanding, as there was in 1948, that the individual companies would be bound to terms acceptable to the others of the group. Accordingly, no security was required to be posted. Otherwise, the bargaining conferences proceeded in the same manner as the earlier ones. Although in the negotiations there was no single representative for the employer group, the negotiations were conducted at meetings at which all the employers were represented, and the representatives of each employer in the group executed an identical contract with the Union on May 24, 1950. Despite the Union's insistence again at these negotiations that it would not bargain with the employers as an association or group, this contract, like the one executed on July 15, 1948, specifically included the Cake Bakers' Association as a party to the agreement.

Contracts covering the terms and conditions of employment of R. K.'s drivers were executed by R. K. and the Union on July 15, 1948, and on May 24, 1950, respectively. The first contract expired by its terms on January 31, 1950,[3] and the second contract expired on October 15, 1951. The Union also negotiated and executed contracts with Gottfried covering the terms and conditions of employment of Gottfried's drivers on September 30, 1948, and "somewhere around July, 1951." By its terms, the first of these contracts expired on January 31, 1951, and the second contract expired on October 31, 1952, subsequent to the hearing before the trial examiner in this proceeding.

Each of the three contracts in issue in this proceeding contained identical provisions dealing with union security, which, in pertinent part, were as follows:

"Recognition

"(a) The employer agrees to hire only members of the Union who shall be in good standing and carry regular paid-up working books of the Union.

\* \* \* \* \* \*

"Replacements

"(a) With respect to replacements or new employees, the Employer will immediately notify the Union of its needs and the Union will make every effort to supply the Employer with suitable and competent men.

"(b) After a satisfactory interview, the applicant is to be given a thirty (30) day trial period, and, if, within the said trial period, the applicant proves unsatisfactory to the Employer, the Employer may then ask for a replacement.

"(c) In the event that the Union shall be unable to furnish help or replacements requested by the Employers, the Employers shall then have the right to make such replacements. In this event, the Employers agree that such non-union help shall become members of the Union

3. The first contract thus expired over a year prior to the filing of charges on February 16, 1951, against the Union and 18 months prior to the filing of charges on July 26, 1951, against R. K. Because the six-months limitation proviso of Section 10(b) of the National Labor Relations Act, 29 U.S.C.A. § 160(b), precludes any finding of unfair labor practices respecting either the *execution* or the *maintenance* of this contract, reference to it is made simply for the purpose of presenting the complete bargaining history of all the respondents herein, and of demonstrating the nature of R. K.'s bargaining operations as a member of the Cake Bakers' Association.

in thirty (30) days subject to its rules and regulations. In the event of the failure or refusal of the employees to become members of the Union within thirty (30) days, [or rejection of the membership application by the Union] [4] such non-union employees shall be forthwith discharged by the Employer.

\* \* \* \* \* \*

"Union Security

"If, with respect to any Employer who is a party to this agreement, the closed shop is in conflict with the law, then the union shop shall prevail in such case together with such additional provisions for union security as shall be legally permissible, it being the intention of the parties to grant the maximum union security permitted by law. \* \* \* "

Beginning on December 27, 1949, during the term of the 1948 contract between Gottfried and the Union, Gottfried's drivers engaged in a strike. Early in 1950, upon the application of Gottfried, an injunction was granted by the Supreme Court of the State of New York against the Union, its officials, and the employee-members of the Union, restraining them from striking in violation of the terms of the 1948 contract. All of the drivers returned to their jobs by April 1, 1950.

As a result of the strike, Gottfried's business had suffered substantially. As a means of reviving it and recouping the losses incurred during the strike, Gottfried and the Union agreed orally to suspend the terms of the 1948 contract, including the union security clauses set forth above. Accordingly, from April 1, 1950, until "somewhere around July, 1951," the date of the execution of the new contract, the operations of Gottfried were conducted on a day-to-day basis with frequent consultations between Gottfried and the Union. Although Gottfried was permitted by this oral understanding to hire whomever it wished, contrary to the contract provisions, the record in this case discloses no announcement to the employees or to new applicants of either the suspension of the contract or of the relaxing of the hiring provisions.

The Board's jurisdiction with respect to Gottfried was conceded at the hearing before the trial examiner. The Board found that Gottfried was engaged in interstate commerce, and "that the substantial effect upon commerce which interruption of its business operation would occasion, warrants the Board's assertion of jurisdiction."

The trial examiner found, however, that R. K. in its sales and purchases did not equal the minimum requirements established by the Board as a criterion for its assertion of jurisdiction, and concluded that, as a matter of policy, the business operations of R. K. did not in themselves warrant the Board's assertion of jurisdiction. The trial examiner found, nevertheless, that R. K. did participate "in an association-wide bargaining group of employers, whose total volume of operations substantially affect commerce within the meaning of the Act," and that in 1950 the employers had in effect constituted themselves "a single employer for bargaining purposes," even though he found no express agreement to that effect. The Board agreed with the trial examiner and concluded that such "associations and their participating members must be regarded as single enterprises," and that "the totality of the operations, in volume and character, of all members of the associations has a substantial effect on interstate commerce." Upon this basis the Board asserted jurisdiction over R. K.

R. K. and the Union, however, both contend that R. K.'s operations do not affect commerce and that, in any event, the Board committed error in considering as a basis for its decision to assert jurisdiction over R. K. the fact that R. K. was operating as a member of an association of employers in its contractual relations with the Union.

---

4. The bracketed phrase appears in the R. K. Baking Corp. contract, but not in the contracts of the Gottfried Baking Co.

There is substantial evidence in the record to support the findings of the Board in this respect. In considering the power of a court to review the Board's exercise of its discretion in asserting jurisdiction, this Court in International Brotherhood of Electrical Workers, Local 501 v. N. L. R. B., 2 Cir., 181 F.2d 34, 36, affirmed 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299, stated: "We should hesitate to say that we could have power ever to review the Board's action because we thought the situation was unimportant; but we need not now decide more than that, if there may be such situations, they must be frivolous beyond rational question, and that the case at bar was certainly within the area of fair differences of opinion, which we must not invade." The basis for the Board's exercise of its jurisdiction in this case was most certainly not "frivolous beyond rational question." The Board's position in this case has been fully described in Vaughn Bowen, 93 N.L.R.B. 1147, where, reaching a conclusion particularly applicable to the contracts in issue in this case, the Board stated:

"The clear effect of this type of bargaining is the establishment of a relationship whose impact on commerce reaches beyond the confines of any one employer involved in the joint bargaining and is coextensive with the totality of the operations of all the employers so involved. And we have recognized this impact in measuring the facts as to commerce in such cases by considering the operations of all the participants in the multiemployer bargaining, whether or not they were parties to the proceeding. It would there-

fore be totally unrealistic and contrary to Board precedent to disregard the commerce facts of the other participating employers in appraising the total effect of either [respondent's] operations on commerce, particularly where, as here, the contracts resulting from such joint bargaining, and the implementation thereof by the parties hereto, form the basis of the unfair labor practice allegations in this case."

The Court of Appeals for the 9th Circuit has twice upheld the Board's jurisdiction in cases where the Board asserted jurisdiction because the employers involved were members of a group of employers which bargained for a common labor contract. See Katz v. N. L. R. B., 9 Cir., 196 F.2d 411; Leonard v. N. L. R. B., 9 Cir., 197 F.2d 435. We think it is unimportant whether or not the Association existed as a formal entity, so long as it is clear that R. K. acted jointly with the other employers in the Association in the negotiation of collective agreements, as the impact upon interstate commerce would be the same in either case. We therefore overrule the jurisdictional objection.

Upon the foregoing facts the Board concluded that the union security clause contained in the two contracts between Gottfried and the Union and in the second contract between R. K. and the Union provided for the preferential hiring of Union members and was, therefore, illegal.[5] It found that the "saving clause" in the various contracts under consideration was too lacking in specificity to prevent the execution or retention of the preferential hiring provisions from constituting an unfair labor practice. The

---

5. The limitations proviso of Section 10(b) of the Act, 29 U.S.C.A. § 160(b), requires that acts alleged to be unfair labor practices may not be the subject of a complaint unless they occurred within the six-month period immediately preceding the filing of the charge with the Board and the service of a copy thereof upon the parties against whom it is made. Since charges against Gottfried, R. K.,

and the Union were not filed until December 27, 1950, July 26, 1951, and February 16, 1951, respectively, the Board did not find the *execution* of the September 30, 1948, Gottfried contract to be an unfair labor practice by either Gottfried or the Union and did not find the *execution* of the May 24, 1950, R. K. contract to be an unfair labor practice by either R. K. or the Union.

Board concluded with respect to Gottfried and the Union that the *retention* of the illegal preferential hiring clause in their September 30, 1948, contract during the six months preceding the filing of charges against them constituted violations by Gottfried of Section 8(a) (1) and by the Union of Section 8(b) (1) (A) of the National Labor Relations Act, 29 U. S. C. A. § 158(a) (1), (b) (1) (A), even though they had agreed that these provisions would not be enforced, and, in fact, were not enforced; but because of this understanding between Gottfried and the Union, the Board concluded that, in retaining the provision, Gottfried did not discriminate against its employees in violation of Section 8(a) (3) and the Union did not cause or attempt to cause discrimination in violation of 8(b) (2). With respect to the contract executed by Gottfried and the Union "somewhere around July, 1951," the Board concluded that by *executing* the contract containing the illegal clause Gottfried interfered with, restrained and coerced its employees in violation of Section 8(a) (1) of the Act, discriminated against them in a manner prohibited by Section 8(a) (3), and as-

sisted the Union in violation of Section 8(a) (2), and that the Union restrained and coerced the employees in violation of Section 8(b) (1) (A) and caused or attempted to cause discrimination against them in violation of Section 8(b) (2).

With respect to R. K. and the Union, the Board concluded that the continued *retention* of the illegal preferential hiring clause in their May 24, 1950, contract constituted unfair labor practices on the part of R. K. on and after August 20, 1950, within the meaning of Section 8(a) (1), (2) and (3), and on the part of the Union on and after August 20, 1950, within the meaning of Section 8 (b) (1) (A) and (2) of the Act.

The Board's order requires each of the respondents to cease and desist from the unfair labor practices found.

The preferential hiring clause contained in the three contracts above-described was clearly illegal as it excludes new applicants at the threshold if they are not members of the Union in good standing, and deprives them of the thirty-day grace period within which they might become members after being hired.[6] We think that the mere execu-

---

6. The National Labor Relations Act, as amended, 61 Stat. 136, 29 U.S.C.A. § 151 et seq., provides in part as follows:

"§ 158. *Unfair labor practices*

"(a) It shall be an unfair labor practice for an employer—

\* \* \* \* \*

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: Provided, That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in section 158(a) of this title as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, (i) if such labor organization is the representative of the employees as provided in section 159(a) of this title, in the appropriate collective-bargaining unit covered by such agree-

ment when made and has at the time the agreement was made or within the preceding twelve months received from the Board a notice of compliance with section 159(f), (g), (h) of this title, and (ii) unless following an election held as provided in section 159(e) of this title within one year preceding the effective date of such agreement, the Board shall have certified that at least a majority of the employees eligible to vote in such election have voted to rescind the authority of such labor organization to make such an agreement: *Provided further*, That no employer shall justify any discrimination against an employee for non-membership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership; \* \* \*."

780

tion of a contract containing such a provision, even apart from its actual enforcement, constitutes "discrimination in regard to hire" on the part of an employer and hence falls squarely within the prohibition of Section 8(a) (3). For, as this Court, in so holding, stated in Red Star Express Lines v. N. L. R. B., 196 F. 2d 78, 81, "the existence of such an agreement without more tends to encourage membership in a labor organization. The individual employee is forced to risk discharge, if he defies the contract by refusing to become a member of the union." See also N. L. R. B. v. Childs Co., 2 Cir., 195 F.2d 617. Since the Union joined in the execution of the contracts containing these illegal provisions and assisted in enforcing them, it follows that the Union "cause[d] * * * an employer to discriminate against an employee in violation of [Section 8] (a) (3)", thus violating Section 8(b) (2). N. L. R. B. v. National Maritime Union of America, 2 Cir., 175 F.2d 686, certiorari denied 338 U.S. 954, 70 S.Ct. 492, 94 L.Ed. 589.

■ Nor is it of consequence, as the respondents contend, that each of the contracts contained a "saving clause," the intended effect of which was to salvage as much union security as possible should the preferential hiring provisions be invalidated. The inclusion of this vague "saving clause" in each contract does not purge the preferential hiring provisions of their illegal effect. Red Star Express Lines v. N. L. R. B., supra; N. L. R. B. v. Gaynor News Co., 2 Cir., 197 F.2d 719, certiorari granted 345 U. S. 902, 73 S.Ct. 640, 97 L.Ed. 1339, reargument ordered 345 U.S. 962, 73 S.Ct. 947, 97 L.Ed. 1382, affirmed by Supreme Court on February 1, 1954.

■■ As to the September 30, 1948, contract between Gottfried and the Union, the Union contends in its brief that "The Trial Examiner found that there was uncontradicted evidence to the effect that the 1948 contract was terminated on or before April 1, 1950," and that, therefore, there is no foundation for the conclusion in the intermediate report that the Union committed an unfair labor practice by retaining in effect the union security provisions of the 1948 contract during the six months immediately preceding the service of the original charge upon it on February 20, 1951. This contention of the Union is not supported by the record. The trial examiner found in the intermediate report that Gottfried and the Union agreed orally only to suspend, not to rescind, the terms of the 1948 contract from April 1, 1950. The trial examiner also found that no announcement of this suspension of the provisions of the 1948 contract, including the illegal preferential hiring clauses, was made to the employees or prospective applicants for employment, although the preferential hiring clauses were in fact not enforced. Upon these facts, the Board correctly found that the retention by the Union and Gottfried of the illegal security provisions of the 1948 contract during the six months preceding the filing of the charges constituted a violation by Gottfried of Section 8(a) (1) and by the Union of Section 8(b) (1) (A) of the Act; and that, in view of the agreed suspension of the security provisions and their actual non-observance during the six months preceding the filing of the charges, Gottfried did not violate Section 8(a) (3), nor did the Union violate Section 8(b) (2) of the Act. As the Board has held in cases where an intention not to enforce an unlawful clause was evident, "Such an unlawful provision serves no less as a restraint on employees' right to refrain from joining an organization than if the parties intend to enforce it where, as here, there is no evidence that the employees were informed that the closed shop clause, which theretofore had been in effect, would no longer be operative." Port Chester Electrical Construction Corp., 97 N. L. R. B. 354.

■ Moreover, the execution by Gottfried "somewhere around July, 1951" of the contract containing the illegal hiring provisions, and the continued retention by R. K. of the illegal hiring provisions in its May 24, 1950, contract, furnished

very substantial support to the Union. The Union was thereby placed in a position of prestige and power which enabled it to further the employment of its members to the disadvantage of nonunion men, thereby placing a premium upon Union membership. The Board properly held, therefore, that such support of the Union by Gottfried and R. K. constituted a violation of Section 8(a) (2) of the Act. N. L. R. B. v. Electric Vacuum Cleaner Co., Inc., 315 U. S. 685, 62 S.Ct. 846, 86 L.Ed. 1120; N. L. R. B. v. Gaynor News Co., supra.

◼ The Union, relying upon N. L. R. B. v. Guy F. Atkinson Co., 9 Cir., 195 F.2d 141, argues that the contracts in issue were executed at a time when it was the policy of the Board not to assert jurisdiction in matters affecting the baking industry, and may not now be condemned as illegal by the retroactive application of the Board's change of policy. But the Atkinson case is distinguishable. There the contract containing the closed shop provision was executed before the date when the Labor Management Relations Act of 1947 became effective and at a time when closed shop provisions in collective bargaining agreements were valid. Hence, the employer in that case was "innocent of any conscious violation of the act." In the case before us, however, the contracts containing the closed shop provisions were executed after the date when the Labor Management Relations Act of 1947 became effective, and the respondents were well aware that the closed shop provisions had been outlawed. We do not see how clauses which are invalid under the Act would become valid merely because the Board chose not to assert jurisdiction. Moreover, there was no change in policy on the part of the Board. The Board's policy applicable to organizations identical with the Cake Bakers' Association had long been established. Air Conditioning Company of Southern California, et al., 81 N.L. R.B. 946; Wirts Distributing Co., et al., 82 N.L.R.B. 669; Indianapolis Cleaners & Launderers Club, 87 N.L.R.B. 472, reversing 85 N.L.R.B. 1198. Furthermore, even the Atkinson case held that the order therein reviewed was not invalid to the extent that it was prospective, "such as the order to cease and desist from recognizing Local 370, and from entering into any contract with it", [195 F.2d 151] so that, in any event, those portions of the order before us which are prospective in operation, and which require each of the respondents to cease and desist from the unfair labor practices as found, would not be invalidated.

◼ As to the 1951 contract between Gottfried and the Union, the Union contends that the trial examiner went completely outside the issues of the case when he purported to find " * * * that, by executing their 1951 contract, including the illegal clauses, in July, 1951 and thus subsequent to the filing and service of the original charges in Cases Nos. 2–CA–1741 and 2–CB–578 and at about the time that amended charges were filed in those cases on July 26, 1951 and served on July 31, 1951 Gottfried Baking Company and the Union committed unfair labor practices * * *." The original charge against the Union was filed on February 16, 1951, and served upon it on February 20, 1951, and, of course, did not contemplate an act which had not as yet occurred. The amended charge against the Union was filed on July 26, 1951, and served upon it on July 31, 1951, and refers to the execution and maintenance of contracts "Since on or about September 30, 1948." The only evidence in the record relating to the date when the 1951 contract between Gottfried and the Union was executed discloses that this contract was signed "somewhere around July, 1951." Whether or not the improper execution of the Gottfried 1951 contract is an issue in the case before us depends upon whether or not it was signed within the six-month period immediately preceding the filing of the amended charge with the Board and the service of a copy thereof upon the Union. This contract was dated February 1, 1951, and there is nothing on its face to suggest that its execution was *nunc pro tunc*. The only

basis for the Union's contention that this contract was not signed on the date which it bears is found in the testimony of one of Gottfried's attorneys, who, when questioned as to when this contract was actually signed, replied, "My guess would be somewhere around July, 1951." But even if this vague estimate be accepted, we believe that the phrase, "somewhere around July, 1951," as commonly understood, refers to a time prior to July 31, 1951, and upon this basis we are inclined to hold, with some hesitation, that the Board properly found that by the execution of their 1951 contract Gottfried and the Union committed unfair labor practices.

■ The Union's contention that the finding of the Board " * * * that the continued retention of the illegal security clauses in the Union's 1950 contract with R. K. Baking Corp. constituted unfair labor practices * * * on the part of the Union on and after August 20, 1950, within the meaning of Section 8(b) (1A) and (2) of the Act," was barred by the six months' limitation proviso to Section 10(b) of the Act, is too frivolous to justify extended comment. The date of August 20, 1950, marks the beginning of the six-month period immediately preceding the service of the original charge upon the Union on February 20, 1951. The original charge specified in part that " * * * the Union has entered into contracts with various and sundry employers in the Bakery Industry in New York City requiring membership in the Union as a prerequisite of employment." The material portion of the amended charge which was served upon the Union on July 31, 1951, was as follows: "Since, on or about September 30, 1948 the above named labor organization by its officers and agents have maintained, executed, and continued in force and effect collective bargaining agreements with * * * R. K. Baking Corporation requiring membership in said labor organization as a condition of employment in violation of Sections 8(b) (1) (A) and 8(b) (2) of the Act." We think that the original

charge gave sufficient notice to the Union of the acts alleged to be unfair labor practices. The violations alleged in the amended charge were "closely related to" the violations alleged in the original charge so that the amended charge was not a new and tardy charge. See N. L. R. B. v. Gaynor News Co., supra; N. L. R. B. v. Dinion Coil Co., 2 Cir., 201 F.2d 484; N. L. R. B. v. Pecheur Lozenge Co., Inc., 2 Cir., 209 F.2d 393.

For the foregoing reasons, we think that the Board's findings with respect to the illegal execution and enforcement of the preferential hiring clauses contained in the three contracts in issue are correct in every respect and support the conclusion that Gottfried and R. K. violated Section 8(a) (1), (2) and (3) of the Act and that the Union violated Section 8(b) (1) (A) and (2) of the Act.

Max Winzelberg, the charging party in these proceedings, had been employed by Gottfried as a route driver intermittently since 1919 and had worked steadily as a driver in its restaurant division from 1940 until the beginning of a strike on December 27, 1949. Winzelberg, although then a member of the Union in good standing, incurred the displeasure of Union officials in 1949 because of refusals to participate in Union activity, notably by refusing to do picket duty in November, 1949, during a strike against Hanscom Bakeries, a subsidiary of Gottfried, and by his refusal to participate in the subsequent strike against Gottfried itself. Upon the conclusion of the latter strike, Winzelberg refused Gottfried's offer of reinstatement to his previous job. Instead, he sought and obtained employment as a driver with the Pechter Baking Co., where he worked for approximately six weeks until he was summarily discharged two days following a visit of a Union delegate to the plant.

Following a period of unemployment, Winzelberg visited the offices of R. K. on December 11, 1950, and applied for a job. Charles Gottfried, president of R. K., with whom Winzelberg spoke, asked him whether he had had any trouble

with the Union and whether his dues were paid up. When Winzelberg informed Charles Gottfried that the Union refused to accept his dues, Charles Gottfried suggested that he tender his dues to the Union again. Winzelberg followed this suggestion and went to the Union office where he offered to pay the dues. There he was informed by the cashier that he had been suspended.

Thereafter, on January 25, 1951, Winzelberg mailed a letter to R. K. in which he again applied for a job as a route salesman. On January 27, 1951, president Charles Gottfried replied to Winzelberg as follows:

"I have your most welcome letter of January 25. Frankly I could use a man of your qualification as a replacement even if only temporary to take over Artie Greenhoots route. He may be out for two or three months and by the time he returns I could use you as a vacation relief man. When this is over we would be glad to establish another route for you as I feel you are just the right man for us. We have had a lot of difficulty in getting replacements from the union. The last experience cost us a fortune and the union has no qualified replacements.

"I know you are marked lousy at the union because of your situation at Gottfrieds. I am very anxious to put you to work immediately but I cannot get involved in a fight with Local 802 on your account.

"I would suggest that you go to Local 802 and try to straighten yourself out with them and get 'a Union Book.'

"If you do this I will put you right to work."

[11] Upon the foregoing facts, the Board concluded that R. K. had refused to hire Winzelberg unless he presented evidence of union membership in the form of a union card, and had thereby discriminated against him in regard to his hire, and encouraged membership in the Union in violation of Section 8(a) (1) and (3) of the Act. The Board further found that inasmuch as R. K.'s refusal to hire Winzelberg constituted compliance by it with the illegal union security provisions of its May 24, 1950, contract with the Union, the Union has, on and since January 27, 1951, the date of R. K.'s refusal, required R. K. to refuse to hire Winzelberg because of his suspension from or lack of membership in the Union, thereby violating Section 8 (b) (1) (A) and (2) of the Act. We think that the Board's findings in this respect are supported by substantial evidence on the record as a whole.

The Union contends that the allegation in the complaint that it had caused or attempted to cause R. K. to discriminate against Winzelberg was barred by the six months' limitation proviso to Section 10(b) of the Act. The original charge, alleging that the Union had caused or attempted to cause R. K., Gottfried, and another employer, Pechter Baking Co., to discriminate against Winzelberg "On or about December 27, 1950, and on various occasions thereafter," was filed on February 16, 1951, and served upon the Union on February 20, 1951, well within the limitation period. This charge formed a sufficient basis for the complaint. It is immaterial that an amended charge, dropping the allegation against Pechter and particularizing the dates of the alleged discrimination by R. K. and Gottfried, was served upon the Union on July 31, 1951, more than six months after the unfair labor practices alleged therein. The allegations in the amended charge were in no sense different in substance from those made in the original charge; the amended charge merely made the allegations more specific. N. L. R. B. v. Westex Boot & Shoe Co., 5 Cir., 190 F.2d 12. See also N. L. R. B. v. Gaynor News Co., supra; N. L. R. B. v. Dinion Coil Co., supra; N. L. R. B. v. Pecheur Lozenge Co., Inc., supra.

The evidence upon which the Board concluded that Winzelberg was discrim-

inatorily refused employment by R. K. consisted of an exchange of correspondence between Winzelberg and R. K., in which the reasons for the refusal to hire Winzelberg, namely, Winzelberg's disputes with the Union and his lack of a "Union Book," are specifically set forth. Winzelberg's uncontradicted testimony that prior to making his written application for employment, his tender of union dues was refused by the Union officials supports the statement in R. K.'s letter of refusal that he was "marked lousy at the union." Furthermore, at that very time, R. K. and the Union were enforcing a collective bargaining agreement containing union security provisions which required preferential hiring. These facts fully support the reasons assigned by R. K. in its letter of refusal to hire Winzelberg: that it could not "get involved in a fight with Local 802 on [his] account." They leave no doubt that Winzelberg was thereby discriminated against by reason of his suspension from or nonmembership in the Union.

 Section 8(a) (3) of the Act makes it an unfair labor practice for an employer "by discrimination in regard to hire * * * to encourage or discourage membership in any labor organization", and Section 8(b) (2) makes it an unfair labor practice for a labor organization or its agents "to cause or attempt to cause" such discrimination. Under these sections, even a lawful union security agreement may be invoked to effect the discharge of an employee for nonmembership in a union only if the employee fails to tender periodic dues and initiation fees. Union Starch & Refining Co. v. N. L. R. B., 7 Cir., 186 F.2d 1008, 27 A.L.R.2d 629, certiorari denied 342 U.S. 815, 72 S.Ct. 30, 96 L.Ed. 617. The discrimination against Winzelberg is even more clear, for, as previously pointed out, the May 24, 1950, contract between R. K. and the Union, by its restriction upon *hiring*, effectively excluded Winzelberg at the threshold because he was not a member of the Union in good standing, and deprived him of any recourse, which he would have had under a lawful union security contract, to the thirty-day grace period within which he might otherwise have tendered his dues after being hired. Moreover, since Winzelberg had tendered his dues and they were rejected, he could not lawfully have been discharged because of his suspension from the Union, even if he had been working for R. K. under a lawful union security contract.

Accordingly, this specific application of the preferential hiring clause already found to be illegal, whereby Winzelberg was deprived of employment, on and after January 27, 1951, constituted discrimination and the causing of discrimination against Winzelberg by R. K. and the Union, respectively, in violation by R. K. of Section 8(a) (1) and (3) of the Act and by the Union of Section 8(b) (1) (A) and (2) of the Act.

 Affirmatively, the Board ordered R. K. to offer Winzelberg immediate employment as route salesman, and ordered the Union to withdraw its objection to Winzelberg's employment by R. K., to so notify R. K. in writing, and to notify Winzelberg in writing that such withdrawal has been effected. The Board's order further required that R. K. and the Union jointly and severally make Winzelberg whole for the loss of earnings incurred by the discrimination against him.

On Petition for Rehearing.

MEDINA, Circuit Judge.

We shall suspend passing upon that part of the order described in the preceding paragraph and remand the case to the Board for the purpose of hearing and determining the matter of the respondents' specific obligations under the "reinstatement" and back pay provisions of its order. In all other respects, the Board's order will be enforced.