**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**R. K. BAKING CORPORATION and Bakery and Pastry Drivers and Helpers Union, Local No. 802, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Respondents.**

**No. 41, Docket 25576.**

United States Court of Appeals
Second Circuit.

Argued Nov. 6, 1959.

Decided Dec. 24, 1959.

Standau E. Weinbrecht, Atty., N.L.R. B., Washington, D. C. (Jerome D. Fenton, Gen. Counsel, Thomas J. McDermott, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Owsley Vose, Atty., N.L.R.B., Washington, D. C., on the brief), for petitioner.

Murray Rafsky, New York City (Smith & Rafsky, New York City, on the brief), for respondent R. K. Baking Corp.

Stanley B. Blumberg, New York City (Cohen & Weiss and Henry Weiss, New York City, on the brief), for respondent Bakery and Pastry Drivers and Helpers Union, Local No. 802, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

Before CLARK, HINCKS and WATERMAN, Circuit Judges.

HINCKS, Circuit Judge.

The National Labor Relations Board petitions for enforcement of its supplemental order requiring the R. K. Baking Corp., hereinafter referred to as "R. K.," to offer Max Winzelberg, the charging party, immediate and permanent employ-

ment as a bakery route salesman and to pay him a $12,438.11 back pay award, the payment to be made jointly and severally with the Bakery and Pastry Drivers and Helpers Union, Local No. 802, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL, hereinafter referred to as the "Union." On a prior petition by the Board, National Labor Relations Board v. Gottfried Baking Co., 2 Cir., 210 F.2d 772, we granted enforcement of the Board's order in so far as based on findings that R. K. had violated Section 8(a) (1) and (3) of the Act, 29 U.S.C.A. § 158(a)(1) and (3), by discriminatorily refusing temporary employment to Winzelberg, and that the Union, by causing such discrimination, had violated Section 8(b)(1)(A) and (2), 29 U.S.C.A. § 158 (b)(1)(A) and (2). However, on the Board's petition for rehearing, instead of passing upon the remedies of instatement and back pay as proposed by the Board, we remanded for further Board hearings on the "respondents' specific obligations under the 'reinstatement' and back pay provisions of its order." Upon such remand the Trial Examiner, by a report dated April 11, 1955, found Winzelberg entitled to the relief herein petitioned for, as above stated. Thereafter,

the Board, because of belated representations of fraud, on its own motion requested this court to expand the scope of the remand to include investigation and findings as to the authenticity and *bona fides* of Winzelberg's application for employment, and R. K.'s refusal thereof. This motion we granted on November 30, 1955.

[1]   At the rehearing, Charles Gottfried, R. K.'s president, testified that he had previously withheld the true nature of the correspondence which made up the application for, and illegal refusal of, employment.[1]   He stated that these letters had been part of a fraudulent plan of his, in which Winzelberg joined, to injure and embarrass Maurice Gottfried, his brother, by establishing an unfair labor practice against his brother's firm, the Gottfried Baking Company. Although the Examiner found both witnesses unreliable at different stages of the hearing, he accepted Winzelberg's testimony that no collusive plan existed and that the letters were, in fact, *bona fide*. Charles Gottfried's story was rejected as implausible on its face, especially in view of Gottfried's unexplained and "incredible" statement that he intended his letter of January 27, 1951 to injure his brother's firm and that he did

1.  [Winzelberg's letter of January 25, 1951 to R. K.]
    "Dear Sir,
    "I am applying for a position of route salesman with your firm. It has come to my attention that you have a position open at this time, due to a salesman's illness.
    "I have worked for many years with a wholesale bakery, and will furnish references if required. I worked for the Gottfried Baking Co., and am considered one of the top men in the line.
    "Kindly advise when I can see you for an interview.
    "Yours truly,
    "Max Winzelberg"
    [R. K.'s reply of January 27, 1951]
    "Dear Max:
    "I have your most welcome letter of January 25. Frankly I could use a man of your qualification as a replacement even if only temporary to take over Artie Greenhoots route. He may be out for two or three months and by the time he

returns I could use you as a vacation relief man. When this is over we would be glad to establish another route for you as I feel you are just the right man for us. We have had a lot of difficulty in getting replacements from the union. The last experience cost us a fortune and the union has no qualified replacements.
    "I know you are marked lousy at the union because of your situation at Gottfrieds. I am very anxious to put you to work immediately but I cannot get involved in a fight with Local 802 on your account.
    "I would suggest that you go to Local 802 and try to straighten yourself out with them and get 'a Union Book.'
    "If you do this I will put you right to work.
    "Very truly yours,
    "R. K. Baking Corp.
    "Charles Gottfried,
    "President."

not realize that it would establish a violation of the Act by R. K., his own firm. While the letters are not free from a ring of contrivancy and artificiality, particularly in view of Gottfried's long standing acquaintance with Winzelberg, it was certainly more reasonable to assume that Winzelberg hoped for, and received, concrete evidence of an unfair labor practice in the rejection by R. K. of his *bona fide* job application, see National Labor Relations Board v. Swinerton, 9 Cir., 202 F. 2d 511, 515, than to accept Gottfried's explanation of the fraudulent conception of the letters. Accordingly, we hold that nothing in the hearings on remand disturbs our earlier conclusions of an unfair labor practice effectuated by R. K.'s letter of January 27, 1951 and caused by the Union. Notwithstanding the contrary arguments advanced by the respondents, the resolution of this question turned largely upon the Examiner's appraisal of the credibility of the two witnesses and his finding is not in direct contradiction of the undisputed facts and the substantial evidence on the whole record. National Labor Relations Board v. James Thompson & Co., 2 Cir., 208 F. 2d 743; National Labor Relations Board v. Dinion Coil Co., 2 Cir., 201 F.2d 484.

The facts upon which the Board ordered instatement to a permanent position and back pay of upwards of $12,000 were as follows. But for the initial discrimination Winzelberg would have been temporarily employed as a replacement for a sick driver from January 27, 1951 to March 10, 1951 and on the basis of the weekly average earnings of the sick driver would have earned $696.36 during this six weeks' period. The Board further found that, under the seniority system prevailing at R. K., Winzelberg, had he been employed as a temporary replacement worker on January 27, 1951, would have had first choice at employment as a vacation relief driver, and that he would have worked at such job from June 18, 1951, when the first opening for a vacation relief man occurred, through Sep-

tember 8, 1951. For this period he was credited with back pay of $1,312.87, an amount equal to the actual earnings of the senior relief driver during that period. The Board then found that, but for the initial discrimination and on the assumption that he would have successively accepted employment as aforesaid as a temporary substitute and a vacation relief man, Winzelberg would have achieved a seniority which would have entitled him to assignment to a permanent route on June 16, 1952, which was the date of the first hiring of a permanent route man by R. K. subsequent to January 27, 1951. This assignment in fact went to one Greenberg on the basis of prior employment by R. K. as a temporary relief man from February 7, 1951 to March 10, 1951. Finding that Greenberg had been continuously employed by R. K. as a regular route salesman on successive routes until April 2, 1955, the date to which employment and back pay liability had been computed,[2] the Board determined that Winzelberg's wage loss during that period would have been $13,879.88, a projection of Greenberg's average weekly earnings for that period minus a 13 week period when Winzelberg had been ill. By deducting Winzelberg's actual interim earnings ($3,451.00) from his gross wage loss ($15,889.11) computed as shown above, the Board reached its conclusion that Winzelberg was entitled to $12,438.11 in back pay.

We think, however, that we may not properly enforce the Board's "instatement" order and that the back pay award may be enforced only in part, since the evidence fails to show that these drastic remedies as applied in favor of this complainant, who never was an employee of the respondent, are necessary to make him whole for the discrimination practiced against him in refusing employment. Cf. Republic Steel Corporation v. N. L. R. B., 311 U.S. 7, 61 S.Ct. 77, 85 L. Ed. 6; National Labor Relations Board v. Remington Rand, Inc., 2 Cir., 94 F.2d 862, 872.

2. The hearing on remand was concluded on March 23, 1955 and the Examiner's supplemental report was dated April 11, 1955.

■ We agree with the Board that for the period from January 27, 1951 to March 10, 1951 Winzelberg was properly awarded back pay in the amount of $696.36. The evidence plainly showed that such an award constitutes no more than fair compensation for temporary employment in a job which was then available but which was wrongfully withheld from him because of the unfair labor practice which had been proved. The Board recognized that such an award would be proper only on proof that Winzelberg had with reasonable diligence sought employment elsewhere and evidence of such effort, especially during this period, is scant indeed. However, the evidence was sufficient, we think, to sustain the Board's finding on this prerequisite to an award.

But even if Winzelberg had been given this temporary employment, subsequent to its termination on March 10, 1951 he would have stood as a stranger to the respondent bakery, wholly without status as an employee. There was no evidence either of contract or of custom whereby for any subsequent period he would have been entitled to the status of an employee with the privileges of seniority which pertained to employees. On June 18, 1951, when the first opening for a vacation relief man occurred, and on June 16, 1952, some fifteen months after his status as a temporary employee would have terminated when the first opening as a permanent route man occurred, he would have lacked status as an employee even if he had had temporary employment until March 10, 1951.

To be sure, Greenberg, who had temporary employment from February 7, 1951 to March 10, 1951, was given permanent employment as a route man on June 16, 1952 to fill a vacancy then occurring. But this appointment, so far as the evidence shows, was due only to the fortuitous circumstance that he was available and qualified—not because of any rights of seniority entitling him to the job. Since the appointment was not sought by a present employee, the respondent employer was entitled to fill the position by anyone it

chose—whether theretofore employed or not. The Board reasoned that the record now, as distinguished from its content as of the time of our initial opinion, "contains concrete evidence as to the incidence of turnover among R. K.'s route salesmen, and as to R. K.'s seniority practices, so that these factors bearing on Winzelberg's opportunities for advancement to a route salesman's job, absent discrimination, are no longer matters of conjecture." But a thorough reading of the record fails to disclose any evidence of a seniority system applicable to R. K.'s ex-employees whereby Winzelberg, who concededly, even absent all discrimination, would not have been employed by R. K. for the year prior to June 1952, would have been entitled to the permanent established route which then became available. And absent evidence of a seniority system enforceable by ex-employees, whether Winzelberg, but for the refusal of the temporary job which in fact expired on March 10, 1951, would have been subsequently employed by R. K., still remains a matter only of conjecture.

■ We hold, therefore, that at least in the setting of this case the unfair labor practice found to have occurred on January 27, 1951 has not been shown to be the proximate cause of failure to appoint Winzelberg to jobs which were not open until long after his temporary employment and his status as an employee had terminated. Accordingly, we grant enforcement to the Board's order for back pay to the extent that it awards back pay of $696.36 and no further.

■ The record discloses substantially the same defect of proof with respect to the Board's order of instatement. Merely because Winzelberg would have had, but for the unfair labor practice proved, six weeks of temporary employment, it does not follow that for fifteen months thereafter he had status as an employee or that he had rights of seniority entitling him to subsequent appointment to a permanent and lucrative position. Whether or not another unfair labor practice occurred on June 16, 1952

when a permanent job first became available, to which Winzelberg was not appointed, is a question never charged, never passed upon by the Board and not now before us. We conclude that R. K. may not now be ordered either to discharge Greenberg or to create a new route, not shown to be needed, in order to make room for Winzelberg. We hold that the instatement provision of the order should not be enforced.

To the extent indicated in the foregoing opinion, enforcement is granted: in all other respects enforcement is denied.