RED STAR EXP. LINES OF AUBURN, Inc. v. NATIONAL LABOR RELATIONS BOARD.

NATIONAL LABOR RELATIONS BOARD v. NEW YORK EMPLOYERS ASS'N, Inc. et al.

Nos. 171, 172, Dockets 22067, 22093.

United States Court of Appeals
Second Circuit.

Argued March 4, 1952.

Decided April 14, 1952.

L. Hand, Circuit Judge, dissented.

George J. Bott, Gen. Counsel, David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, Owsley Vose and Ruth V. Reel, Attys., all of Washington, D. C., for National Labor Relations Board. Frederick U. Reel, Washington, D. C., of counsel.

Gleason & Doyle, Auburn, N. Y., for Red Star Exp. Lines of Auburn, Inc. John P. Doyle, Auburn, N. Y., of counsel.

John J. Walsh, New York City, for respondents Local 182 and New York State Teamsters Council.

William J. Cavers and John C. McRee, Buffalo, N. Y., for Gen. Counsel.

Arthur A. Darrigrand, Utica, N. Y., for Richard F. Mullen.

Before L. HAND, AUGUSTUS N. HAND and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

■ In the proceeding brought by the Red Star Express Lines of Auburn, Inc. (hereinafter called the Company) it petitioned this court to review and set aside so much of an order of the National Labor Relations Board as required the Company to replace its employee Richard Mullen in his former position of employment and to make him whole for any loss of pay he might have suffered. The Board held that Mullen had been discharged by the Company in violation of Section 8(a)(3) of the Taft-Hartley Law, 29 U.S.C.A. § 158(a)(3), because of his activities in opposition to the union [1] with which the Company had a collective bargaining agreement. The company argues that Mullen was discharged because he refused to take a medical examination when directed to do so by one of its officials. However, the motive underlying the discharge was clearly a question of fact and, upon consideration of the record as a whole, we hold that the Board's conclusion was justified. Mullen's testimony as to the conversations he had with Weaver and Rowlands, the Company's General and Sales Managers, respectively, established that the Company, shortly before the discharge, was seeking Mullen's resignation in order to relieve itself of difficulties with Local 182 caused by Mullen's activity in attempting to form a rival union. In the absence of any prior practice requiring sick employees to take medical examinations, the timing of the Company's request that Mullen submit to an examination might naturally lead to the inference that the Company's motive was not solicitude for Mullen's health, but rather a desire to precipitate a situation which it thought would justify a discharge. We think that the Board could reasonably infer that Mullen's refusal to take the examination, especially when he offered an affidavit as to his health from his own doctor, played no part in the Company's decision to discharge him. In other words, there was substantial evidence to support the finding of the Board that Mullen was discharged because of his activities in opposition to the union.

■ Likewise, the finding of the Board that Mullen was an ordinary employee and not a supervisory employee within the meaning of Section 2(11) of the Act, 29 U.S.C.A. § 152(11), is amply supported by the record. The testimony disclosed that he had no authority to hire or fire other employees; that all managerial decisions

1. Local 182 of Utica and Central New York, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, A. F. L.

other than the most menial were made for him and not by him; that his job as night superintendent was filled by other employees in his absence; and that any other employee with higher seniority could have had the job since it was posted for bidding under a practice whereby the employees were to bid on particular jobs according to their seniority. The fact that Mullen was designated by the title "superintendent" did not exclude him from protection under the Act unless he also possessed one or more of the incidents of that status which are set forth in Section 2(11). Accordingly, the petition of the Company to set aside the order of the Board is denied.

The second proceeding is a petition by the Board for enforcement of its order[2] against the Company, Local 182, the New York State Employers' Association, Inc. (hereinafter called Association), and the New York State Teamsters Council (hereinafter called the Council). The order directs those respondents to cease and desist from entering into or giving effect to the union security provisions of collective bargaining agreements which require employees to maintain their membership in a labor organization as a condition of employment, or from any form of interference with the rights granted employees under Section 7 of the Taft-Hartley Law, 29 U.S.C.A. § 157.

The Association is an organization of about sixty-eight motor carriers in Western and Central New York. One of its functions is the negotiation of uniform collective bargaining agreements with labor unions on behalf of its members. Since 1944 the Association and the Teamsters Council have maintained a master collective bargaining agreement covering the employees of the Association's members, and

the Company, which was a member of the Association, and Local 182 have had a similar agreement between themselves.[3] The union security clauses of these agreements provided that the employer would hire only union men if available but if they were not available, could employ non-union men upon the condition that they become members of the union within twenty-four hours after employment. The 1944 agreements were renewed as between the Association and the Council and between the Company and the Union in 1946 and 1947. During the negotiations leading up to the renewal of the master agreement on July 1, 1948,[4] the Council and the Association were unable to agree whether certain provisions of the 1944 contract were made illegal by the enactment of the Taft-Hartley Law. Accordingly, in a letter dated August 2, 1948, the Council and the Association agreed upon the following addendum to their collective bargaining contract:[5]

"As per our discussion between your State Committee and our State Committee as regards the recently passed Taft Hartley Law, pending clarification of the many phases of the Law that may effect [sic] one or more clauses in our 1944 contract, we hereby agree that all clauses that are affected by the law shall be considered null and void but it is understood that when and if such clauses are declared legal, they shall immediately become part of our statewide agreement and shall be considered in full force and effect.

"Consider this as part of the Master Stipulation that was signed between us * * *"

It is urged that the addendum was sufficient to suspend the operation of the union-security provisions of the con-

---

2. A part of the order as to which the Board seeks enforcement has already been discussed in connection with the Company's petition, and should be enforced.

3. It is not clear whether the Association or the Council had authority to bind its members to the terms of the master agreement. Apparently the practice was that individual members of the Associa-

tion and the constituent locals of the Council executed separate agreements which varied but slightly, if at all, from the master contract.

4. Apparently the agreement was renewed after July 1, 1948 but was made retroactive to that date.

5. There is no indication in the record that the Company and the Union included such an addendum in their separate agreement.

tract which, concededly, were illegal under the Taft-Hartley Law. 29 U.S.C.A. § 158(a)(3). We do not agree. The execution of a contract containing a forbidden union-security clause constitutes an unfair labor practice.[6] This is so because the existence of such an agreement without more tends to encourage membership in a labor organization. The individual employee is forced to risk discharge if he defies the contract by refusing to become a member of the union. It is no answer to say that the Act gives him a remedy in the event that he is discharged. The Act requires that the employee shall have freedom of choice, and any form of interference with that choice is forbidden.[7] The contract as modified by the addendum continued to be such an interference and constituted an unfair labor practice. For the question is not only whether under principles of contract law the addendum would contractually negative the illegal union security clauses, but whether it would have the effect of preventing the coercion that would otherwise follow from the renewal of the earlier agreements. The Board found it would not have such an effect "because it fails to specify which, if any, clauses were to be suspended."[8] In our opinion the Board was entitled to adopt this view as a matter of sound policy and reasonable interpretation. The vague language of the addendum would not help the ordinary employee to understand that the union security clause was no longer binding. The parties themselves were unable to determine which parts of the contract were affected by the Taft-Hartley Act. Employees certainly could not be expected to understand the scope of such a proviso even if it had been communicated to them, as it was not. We, therefore, hold that the respondents were guilty of unfair labor practices as found by the Board.

The petition of the Board for the enforcement of its order is granted.

L. HAND, Circuit Judge (dissenting).

The letter of August 2, 1948 may be paraphrased as follows without violence to its meaning: "Until the courts decide what the Labor Management Relations Act means as to any clause in our contract of 1944 which is 'affected' by that act we agree to treat such a clause, as though it was not in the contract." That, I submit, meant that until the courts decided otherwise, the "closed shop" clause was to be deemed not in the contract; for there is no dispute, I take it, that the "closed shop" clause in the contract was "affected" by the act. Maybe my brothers think otherwise; but in any event, I understand them to say, that even though, as a matter of contract, the addendum did eliminate the "closed shop" clause, its effect, when coupled with the original contract, was so equivocal that an employee would not know whether or not the parties had agreed to a "closed shop," and that this uncertainty made the contract an unfair labor practice, since it enabled both the employer and the union to discriminate against a nonunion man under § 8(a)(3) and tended to force him to join the union under § 8(b)(4)(A). I should altogether agree, if the union and the employer had suppressed the addendum in order to deceive employees into believing that the parties were still working under a "closed shop" agreement; but I cannot agree, if, although they drew their contracts in an

6. N. L. R. B. v. National Motor Bearing Co., 9 Cir., 105 F.2d 652, 660; Donnelly Garment Co., 50 N. L. R. B. 241, enforced Donnelly Garment Co. v. N. L. R. B., 8 Cir., 165 F.2d 940; Amalgamated Meat Cutters and Butchers Workmen of North America (A. F. L.), 81 N. L. R. B. 1052; Unique Art Manufacturing Co., 83 N. L. R. B. 1250.

7. The Board points out that the proviso clause of section 8(a)(3) which allows the "making" of a union-shop contract under certain prescribed conditions negatively implies that absent those condi-

tions the "making" of such an agreement would be an unfair labor practice.

8. In reaching this conclusion the Board followed a rule evolved in certification proceedings where it had been held that an existing contract which included an illegal closed-shop provision did not constitute a bar to a new election despite a saving clause in the contract similar to the one involved here. Reading Hardware Corp., 85 N. L. R. B. 610; Louis Dix, 88 N. L. R. B. 327; Lykens Hosiery Mills, Inc., 82 N. L. R. B. 981; Unique Art Manufacturing Co., supra.

honest effort to conform to the law, they drew them so inartificially that the meaning was not clear. Everyone will agree that the inept draughting of a contract cannot be an unfair labor practice.

The Board found that "the parties deliberately used the vague language of the addendum to eliminate disagreement among themselves as to which clauses were affected." That is true, but it gives no color for supposing that they were combining to bemuse any employees, present or future. The Board next found that the addendum was not intended to remove the "coercive effect of the unlawful union-security provision" because the parties did not "notify the employees of the existence of the addendum"; and because "the union hiring hall and union-determined seniority * * * continued to be followed by the parties." It is true that the addendum was not sent out to the employees, and it is of course possible that this was done because the parties wished to suppress it, and to give the employees to understand that the "closed shop" was still in force; but I can find no substantial evidence to support that finding. DePerno, the president of Local 182, swore that after the agreement was made he went back to Utica and "immediately turned the settlement over to the girls in the office to mimeograph and push out to all the locals in the state." Shortly thereafter the president of the employers association called him up and asked him: "What about the Taft-Hartley law that we agreed that you were going to put in there?" DePerno's testimony continued that that was "the first time I realized that it wasn't in there even though we had agreed and what causes (caused) the error was the fact that we had the mediator's decision or the settlement which I turned over to the girl and didn't give her the other sheet of paper that we settled amongst ourselves as regards the law." In reply to Durkin's inquiry he asked whether, having sent out the notices, he had "got to get them all back and destroy them and throw them away, or what?" They finally agreed DePerno should send Durkin a letter which Durkin should sign and send back, because "all decisions come through both

Councils." I can find no contradiction of this anywhere in the record, and in the absence of any indication that the trial examiner discredited DePerno, it seems to me that we should accept his testimony. That would seem to follow from the decision in Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. If so, there is no support whatever in the evidence for the conclusion that the failure to notify the employees was owing to a desire to make them suppose that the parties were still working under a "closed shop."

The Board's second finding is that there was evidence that in fact the parties continued the "closed shop." This my brothers do not expressly affirm and as I understand, they do not accept it. At any rate, it appears to me not to be "supported by substantial evidence on the record considered as a whole." Weaver, the association's manager, and DePerno both swore that the parties had not followed the "closed shop" thereafter, and the only contrary evidence was that of Mullen, the employee, upon whose charge the proceeding was started. It is true that he was not discharged until March, 1949, and it would therefore be possible to read his testimony as covering a period after August, 1948. The substance of what he said was as follows: "Q. Well, who would determine how many dock men were needed at night? A. Well, Hassett would call the hall before five o'clock? * * * Well, if he needed help he would call the union hall and they would come to work. * * * Q. In other words the company hired the extra men from the union hall? A. Yes, * * * Q. So if there was need for extras after five o'clock you wouldn't have hired him (sic) because the union hall was closed, is that right? A. That is right."

The examiner did not, it is true, credit Weaver upon another issue; but it does not follow that he did not believe him on this point and at least he gave no indication that he discredited DePerno's testimony that after the addendum was signed Local 182 made no "attempt to enforce the union security" ("closed shop") "provisions of the contract." In the face of these denials

it does not seem to me that Mullen's testimony about the "closed shop" should prevail; it was not fixed in time and may well have referred to what was the practice before August 2, 1948. Hence I can find no reason to sustain the conclusion that the parties were trying to enforce a "closed shop" after that date, and *pro tanto* the order should not be enforced.