Bernard L. **ALPERT**, Regional Director of the National Labor Relations Board, Petitioner,

v.

**INTERNATIONAL TYPOGRAPHICAL UNION, AFL–CIO, et al.,** Respondents.

Civ. A. No. 58–203.

United States District Court
D. Massachusetts.

March 19, 1958.

Supplemental Opinion May 7, 1958.

428

Bernard L. Alpert, Regional Director National Labor Relations Board, Julius G. Serot, Washington, D. C., for petitioner.

Gerhard Van Arkel, Van Arkel & Kaiser, Washington, D. C., Robert M. Segal, Boston, Mass., for respondents.

ALDRICH, District Judge.

On February 25, 1958 the Regional Director of the National Labor Relations Board filed this proceeding under § 10(j) of the Labor Relations Act, 29 U.S.C.A. § 160(j), to enjoin, pending a final determination by the Board, a strike against the Haverhill Gazette, a newspaper published daily, except Sunday, in Haverhill, Massachusetts. The respondents are the International Typographical Union, known as the ITU, and the local union. I will sometimes refer to them collectively as the union. Attached to the petition is a copy of the complaint filed by the Board on November 29, 1957 after complaint by Gazette. That complaint asserted primarily that the union was committing an unfair labor practice in that it had refused to bargain collectively by insisting upon an agreement containing various illegal conditions. The union had submitted a written proposed agreement, hereinafter called the proposal. The complaint listed in detail some nine allegedly illegal sections thereof. One of these sections was Article 1, § 8, which incorporated by reference into the proposal all of the so-called General Laws of the ITU, hereinafter called the Laws, to govern "subjects concerning which no provision is made in this contract."[1] The complaint

---

1. The entire clause provides as follows: "8 * * * The General Laws of the International Typographical Union, in effect January 1, 1956 [1957 intended] not

itemized a number of these Laws that it contended were illegal. There were further claims advanced, but my decision does not depend on them, and adequate discussion would unduly enlarge this opinion.[2] The complaint concluded with a recitation of union activities since the strike which were having deleterious economic effects. The petition filed in court on behalf of the Board followed, with some exactness, the complaint.

A motion for summary judgment was filed by respondents, and denied. Thereafter testimony was taken. Petitioner's first two witnesses were management employees of Gazette, whose testimony indicated that up to, but not including, November 20, 1957, negotiations between Gazette and the union were almost exclusively over § 5 and § 8 of Article I of the union's proposal,[3] and that whether there were other unresolvable differences between the parties had yet to be really explored. On November 8 the local union had informed Gazette that at the next conference it planned to be represented by negotiators from the ITU, and that it assumed Gazette would, accordingly, wish to be represented by negotiators from the New England Daily Newspaper Association. Such a conference took place on November 20. All that transpired was a cryptic exchange between the two sides, which, in view of the previous relationships of the parties, I find was understood by both to mean that management considered that many paragraphs in the proposal were illegal, and that the union disagreed. Thereupon the union broke up the conference and declared a strike.[4] The next day, at the request of state and federal mediators, a conference was held, which they attended. At this conference the entire proposal was examined, paragraph by paragraph, and management indicated specifically what it objected to, and what it "would not hang the contract on." I take this to mean that management separated out those paragraphs on which it would bargain, and those on which it would not. Conversely the fact that the union continued to strike thereafter would warrant my finding that it, too, would not bargain on these same provisions. Just what the full scope of disagreement was I do not find, deeming it immaterial, beyond the fact that § 8 of Article I, the provision that the Laws should be incor-

in conflict with law, shall govern relations between the parties on those subjects concerning which no provision is made in this contract." At the hearing the union offered to show that it had sought, shortly after the strike began, to insert after the phrase "not in conflict with law" the words "or this agreement." I excluded this testimony as immaterial.

2. For purposes of possible appeal by petitioner I will say that to all intents and purposes I rule them out as matter of law.

3. Section 5 was a jurisdictional matter. The union wanted to bargain for future processes, said to be substitute composing room work, in case Gazette ever adopted such processes. The petitioner has failed to show that this conduct was so unreasonable as to warrant an injunction, as distinguished from some possible future finding by the Board, a matter on which I express no opinion.

4. There was a dispute as to who actually called the strike—the local union, or the ITU. I find that under the ITU By-

Laws (which are separate from the Laws, but which constitute an agreement binding on the ITU and the local) strike procedure is for the local first to ask ITU permission, and then if, but only if, this is granted, as a result of secret ballot of its members, the local may decide to strike. I find that prior to November 19 the local union requested permission, and the ITU, by action at its head office in Indianapolis, vested in one Lyons, its vice-president, authority to give permission at Haverhill. On November 19 the local, either with Lyons' permission, or subject to it, voted to strike if Gazette would not accept certain fundamental demands. On November 20 Lyons represented the local at the bargaining conference. When he emerged with the news that Gazette was standing firm, whatever his form of words, he announced the moment to strike had arrived. I go into this at some length because a question has been raised whether ITU is a proper party to these proceedings. I find and rule that it is.

porated, was, and continued to be, an essential matter.

The respondents concede, as they must, that the Laws are not in all respects in accordance with law.[5] They point, however, to the phrase "not in conflict with law," contained in § 8 of the proposal, as a result of which they say that nothing illegal in the Laws is to be regarded as incorporated. Whether this is sufficient as a matter of strict contract law I feel need not be determined. To set forth specific provisions, and then state, generally, that no part that is illegal is intended, may not automatically remove all problems. The test may be whether the parties later modify the specific illegal terms in the light of this general provision, cf. Maryland Casualty Co. v. Dunlap, 1 Cir., 68 F.2d 289, or, instead, insist upon them, cf. Eastern Expanded Metal Co. v. Webb Granite & Const Co., 195 Mass. 356, 81 N.E. 251. In the case at bar by seeking to provide that the Laws could not be arbitrated, and should be, petitioner contends unilaterally, construed by the Executive Council of the ITU, and that no Law could even be discussed at the bargaining table, the union might be said to have gone far towards disproving fluidity of mind on this subject.[6] However, I hold that the test need not be one of strict legality as a matter of court construction of the contract, but the more general one of legality under Taft-Hartley. On a number of occasions it has been held that labor agreements containing specific illegal pro-union terms are not saved from violating the Act by a general provision that whatever

is contrary to law is not to be considered. Red Star Express Lines of Auburn v. National Labor Relations Board, 2 Cir., 196 F.2d 78; National Labor Relations Board v. Gaynor News Co., 2 Cir., 197 F.2d 719, affirmed in conjunction with Radio Officers, etc., v. National Labor Relations Board, 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455; National Labor Relations Board v. Gottfried Baking Co., 2 Cir., 210 F.2d 772; National Labor Relations Board v. E. F. Shuck Construction Co., 9 Cir., 243 F.2d 519. This is because "an employee cannot be expected to predict [I might say, understand] the validity or invalidity of particular clauses," Gaynor, supra, 197 F.2d at pages 723–724, and is subject to persuasion or pressure thereby. Even such a limited closed shop clause, though not enforced, "tends to encourage membership." Red Star, supra, 196 F.2d at page 81; E. F. Shuck Constr. Co., supra. Nor do I draw the distinction made by the union between incorporation by reference, subject to a general exclusion clause, as here, and a contract all in one document, with a general savings clause, as in the more usual case. The Board argues it is even worse, because when the Laws are exhibited all in one piece, the exclusion clause does not even appear. I do not necessarily agree with the Board's position, but I do not adopt the union's.

The union says how could these provisions of the Laws have any such consequence; who sees them? It seems to me they are precisely what employees would be particularly concerned with. In any event, the union's question carries little

5. The petition lists some sixteen paragraphs that to either more or less extent, some very clearly, provide for a closed shop, or tend to encourage one.

6. Paragraph 10, the Arbitration clause in the proposal, provides that "the General Laws of the ITU shall not be subject to arbitration." Article II, § 3, of the Laws is of similar content. The president of the ITU testified that this did not mean that the factual application of a Law was not arbitrable, and pointed, also, to Article XIV of the Laws, to the effect that where " * * * the enforcement or observance of provisions of the General Laws would be contrary to public law they are suspended." He neglected to point to Article III, § 1, which provides, in part, "We confidently assert that there are certain provisions in the Labor Management Relations Act of 1947 that are unconstitutional and invalid * * *. There should not be, and will not be, any attempt on the part of the ITU, or its subordinate unions, to violate any *valid* provisions of law." (Italics supplied.) It seems to me this leaves the situation something less than satisfactory.

force when its conduct has shown that it considers their incorporation, complete to the final comma, so important that it is willing to strike for it. The Board's charge that there has been a violation of § 8(b) (1) (A) seems very questionable. I hold, however, that the union's demand, and resulting strike, is a violation of § 8 (b) (2), as an attempt to cause the employer to discriminate, and, by the same token, of § 8(b) (3), as a refusal to bargain collectively. 29 U.S.C.A. § 158. As the cases cited indicate, the mere execution of an agreement as is here involved would be a violation of § 8(a) (3). It must follow that insistence upon the employer so agreeing as a condition of bargaining is a double-barrelled violation of § 8(b). I am not moved by respondents' attack on the Board's right to use the term "adamant insistence." A strike is insistence enough. Nor am I impressed by repeated assertions that the union is not refusing to bargain since the record is clear that it has always wanted a contract. I agree it is clear that it wants a contract, but I find the Board has reasonable cause to believe that it wants one only in terms that the law forbids. In this respect the rationale of the cases earlier cited applies with even more force to the facts at bar than those then considered. In Red Star Express Lines v. National Labor Relations Board, 2 Cir., 196 F.2d 78, the court condemned the contract although the so-called general savings clause provided that any specific provision which was even "affected" by Taft-Hartley was to be without effect. It might not be too difficult to excise the illegal taints from such an agreement. In the case at bar they are far more inextricable, as well as more often repeated. In their joint brief respondents said,

"It is true that disagreements may arise concerning under what circumstances the application of Laws might violate federal or state laws * * *. It is Utopian to suppose that anyone could spell out the myriad circumstances under which such Laws might be applied, and to declare in advance when they might, or might not be, validly applied."

I quite agree. But if union lawyers cannot separate the wheat from the tares, how can Gazette, Gazette's employees, and prospective employees? A collective bargaining agreement should be understandable in the market-place, not in Utopia. Its specific provisions must be compatible with the Taft-Hartley Act on their face, and not as the result of some subsequent elimination or construction.

On this motion for an injunction after hearing, as distinguished from a restraining order, I am not at all sure that it is incumbent upon the Board to show, in addition to reasonable cause as aforesaid, that the strike is causing irreparable injury. However, in this regard evidence was introduced and I find, if material, that the strike caused suspension of publication for three days, and that thereafter Gazette's circulation and advertising (both as to volume and gross returns) were each cut in half. The strike was called on November 20. Publication was resumed on November 25. On December 16 a rival paper, which had first published the previous two weeks as a throw-away, commenced publication on a daily basis. This paper did not cause the initial reductions aforesaid, which began immediately on November 25, encouraged by activity by the local union. To some extent I quite assume the existence of a new paper contributes to Gazette's ills, but I find that it is by no means fully responsible. Furthermore, the question might well be asked if this second paper could have started or continue had it not been for the strike, and its consequences.

No evidence was introduced as to the newspaper business in general, but I think it is common knowledge that newspapers today, vulnerable to other types of competition, are unable to withstand much direct competition. Indeed, in a relatively small local area it is not unreasonable to suppose that two competing papers cannot long both survive. I find that the strike has caused irreparable in-

jury to Gazette. I further find that while the possible going out of business of one local newspaper, whether its newborn competitor survives or does not, is not a matter of world-shaking importance, it is a matter of public interest and concern. In view of what I find to be a clear case of apparent unfair labor practice by the union, I do not believe that anything further is required to warrant the issuance of an injunction. I will hear the parties as to form.

### Supplementary Opinion.

■ This matter, originally brought before the court by a petition for an injunction filed February 25, 1958, presented at the outset a not inconsiderable number of questions. See opinion herein of March 19, 1958. Since that date the questions have, in certain respects, multiplied. In others they have diminished. The thrust of the petition, which followed a complaint by the employer, was that the respondent local union was refusing to bargain by striking to obtain, over the objection of the employer, inclusion in the agreement of certain clearly illegal provisions. Since March 19th the respondents have withdrawn, at least pro tem., their insistence on incorporating in their proposal their General Laws, so-called, some of the provisions of which had been found illegal by the court. The court retained jurisdiction. The strike continued over other issues. Now led by possibly incautious remarks of the court, respondents have made a number of supplementary requests. One is that the court issue a declaratory judgment that with some now proposed changes incorporation of the General Laws would not be illegal. Alternatively, they ask that if its provisions are still illegal, the court declare what should further be done to cure the defects. Pausing here for a moment, the number of items which petitioner still contests are extensive; indeed, petitioner now objects to more than he did originally. I will not, and, in my opinion, could not revise and rewrite the General Laws into some new form that might or might not meet the future approval of the parties. This would certainly be an advisory opinion as distinguished from declaratory relief. The most that I could consider in this direction would be to say that what is submitted is, or is not, acceptable.

■■ Respondents make a third suggestion, namely, that I permit the parties to negotiate on the basis of the proposed amended Laws whether the negotiations proceed along legal or illegal lines, leaving to some future determination, if the question arises, the decision of whether whatever agreement is ultimately reached is legal or not. The court has been informed that the employer is presently willing, in view of the changes already made, to negotiate on such a basis. Petitioner says this last suggestion would take matters right back to where they started. I think he misconceives the scope and purpose of this proceeding. The purpose of an injunction under § 10(j), 29 U.S.C.A. § 160(j) is not to prevent bargaining that the Board may think illegal, but to prevent an illegal cessation of bargaining. The injury aimed at is the interruption of the status quo by such latter action, which may be irretrievable by the time the Board has had an opportunity to process a complaint. See S.Rep. 105, 80th Cong. 1st Sess., p. 27 (1947); Building & Construction Trades Council Orange County v. Le Baron, 9 Cir., 181 F.2d 449. The mere possibility of the parties voluntarily reaching an illegal agreement is not injunctive stuff.

When this petition was brought it was on the ground that negotiation had ceased. Striking to obtain illegal provisions, against the wishes of the employer, is a refusal to bargain which may justify extraordinary relief. It is something else for the Board to ask me to enjoin negotiations which both parties are willing to proceed with. Even if some illegal provision may remain in the proposal, and a once unlawful strike has contributed to the employer's present receptive attitude, it does not follow that I should adopt petitioner's position and enjoin negotiations on all the General

Laws, lawful as well as unlawful, or enjoin the strike until I have determined every question petitioner raises. The parties having informed the court of a willingness to negotiate on the basis of the Laws as now revised, there is no occasion for an injunction. The respondents are relieved of their stipulation of March 20, 1958 to the extent of permitting them to negotiate on the basis of incorporating in the agreement their General Laws, so-called, in the form presented to the court by respondents' letter of March 27, 1958.