278 F.2d 6
 INTERNATIONAL TYPOGRAPHICAL UNION LOCAL 38, AFL-CIO and
International Typographical Union Local 165,
AFL-CIO and its Scale Committee, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
INTERNATIONAL TYPOGRAPHICAL UNION, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 Nos. 5509, 5510.
 United States Court of Appeals First Circuit.
 Heard Dec. 2, 1959.
Decided May 10, 1960, Rehearing Denied June 10, 1960.
 
 Robert M. Segal, Boston, Mass., and Gerhard Van Arkel, Washington, D.C., with whom Arthur J. Flamm, Boston, Mass., Henry Kaiser, George Kaufmann, Washington, D.C., Segal & Flamm, Boston, Mass., Van Arkel & Kaiser, Washington, D.C., and Dickstein, Shapiro & Galligan, New York City, were on brief, for petitioners.
 Melvin Pollack, Washington, D.C., Atty., with whom Stuart Rothman, Gen. Counsel, Thomas J. McDermott, Associate Gen. Counsel, and Marcel Mallet-Prevost, Asst. Gen. Counsel, Washington, D.C., were on brief, for respondent.
 Before WOODBURY, Chief Judge, HARTIGAN, Circuit Judge, and WYZANSKI, District Judge.
 WOODBURY, Chief Judge.
 
 
 1
 The Haverhill Gazette Company and the Worcester Telegram Publishing Company, Inc., Haverhill and Worcester or collectively the employers hereinafter, are and for years have been engaged in the business of publishing daily newspapers in their respective Massachusetts communities. Both subscribe to interstate news services, advertise nationally sold products and enjoy annual gross revenues from their publishing operations in excess of $500,000. For a great many years the composing room employees, that is to say the printers, of Haverhill have been represented by Local 38 and the composing room employees of Worcester have been represented by Local 165 of International Typographical Union, AFL-CIO. Preexisting contracts between Haverhill and Worcester and the local unions representing their composing room employees having in each instance long expired, and in each instance attempts to negotiate new agreements having come to naught, strikes of the composing room employees of both employers ensued. At this juncture, on separate charges filed by Haverhill and Worcester, General Counsel for the National Labor Relations Board on February 6, 1958, filed separate complaints against the parent union, ITU hereinafter, and the local involved in each situation[1] alleging that the respondents had been and were engaging in various acts and conduct in violation of the Labor Management Relations Act, 1947, 29 U.S.C.A. 141 et seq., 61 Stat. 136, as amended. The cases were consolidated for hearing by order of the Regional Director and hearings in the Worcester case were held in Worcester by a trial examiner in April, 1958. At those hearings evidence was introduced and counsel stipulated for the incorporation in the record in that case of the testimony of the president of ITU adduced in the New York Mailes Case, so called, Board Nos. 2-CB-4967, 2-CB-1769 and 2-CB-1807, and of the testimony in a proceeding under 10(k) of the Act between ITU and Worcester. Counsel also stipulated that the record in a proceeding in the United States District Court for the District of Massachusetts for an injunction under 10(j) of the Act entitled Alpert v. International Typographical Union, D.C.Mass.1958, 161 F.Supp. 427, should constitute the record in the Haverhill case.
 
 
 2
 On the evidence before him in both cases the trial examiner found that the respondents had engaged and were engaging in some of the unfair labor practices charged against them in the complaints but had not and were not engaging in others, and recommended an order which he thought appropriate to his findings. Exceptions to the trial examiner's intermediate report, with supporting briefs, were filed by the respondents but the Board, with an exception to be noted hereinafter, affirmed the trial examiner and adopted his findings, conclusions and recommendations as its own. The respondents thereupon filed a petition in this court to review that order and set it aside and the Board countered with a petition for enforcement of its order.
 
 
 3
 There is little dispute over the facts, and the facts and issues in both cases are essentially the same. In both cases protracted negotiations for new collective bargaining agreements, in which officers of ITU participated with representatives of the local unions and officials of the New England Daily Newspaper Association, Inc., participated with the employers, finally broke down and in consequence late in November, 1957, the locals with ITU sanction and approval called the composing room employees of both employers out on strike. In each instance the bones of contention were much the same. The representatives of the local unions backed by the representatives of ITU adamantly insisted upon the inclusion of three clauses in any new contract and the representatives of the employers as adamantly insisted that the clauses were illegal and that no contract would be entered into in which the clauses were included. Moreover, regarding inclusion of the clauses as 'key' issues both the employers' and the unions' representatives declined seriously to explore economic issues such as hours, overtime, pensions, summer holidays,[2] ect., until agreement should be reached on the clauses they regarded as crucial.
 
 
 4
 The three clauses on which the negotiators deadlocked were the jurisdiction, foreman[3] and general laws clauses which may as well be briefly described at this point.
 
 
 5
 The jurisdiction clause, on which the unions in both instances insisted, covered persons engaged in a number of new processes and operations, in addition to those covered by the jurisdiction clauses of the old contracts, which new processes and operations the unions considered substitutes for the processes and operations traditionally performed in the composing room by printers but which, with two exceptions, the employers were not using and did not contemplate installing in their plants.[4] The foreman clause provided that the composing room foreman, who had the power to hire, fire and process grievances, had[5] to be a member of the union although he would be exempt under certain circumstances from union discipline for activities on behalf of management. The general laws clauses provided that the General Laws of the International Typographical Union in effect on January 1, 1956 (or in another version at the time a contract was signed), if not in conflict with state or federal law, should govern relations between the parties on those subjects concerning which no provision was made in the contracts.
 
 
 6
 The trial examiner found that the unions were genuinely desirous of securing contracts with Worcester and Haverhill but that the evidence clearly showed that they insisted upon the acceptance of the jurisdiction, foreman and general laws clauses as written as a condition precedent to the execution of any collective bargaining agreements. But, believing the clauses illegal, the examiner concluded that by insisting that the employers agree to them the unions had refused to bargain collectively with the employers in violation of 8(b)(3) of the Labor Management Relations Act, 1947.[6] He also found that the primary object or purpose of the strikes called by the unions and their agents against the employers was to force the latter to accede to the unions' demand for inclusion of the three clauses he thought illegal and from that finding concluded that the unions had violated 8(b)(2)[7] of the Act in that they had attempted to cause the employers to encourage union membership by discrimination in regard to hire, tenure, terms or conditions of employment. As to the foreman clause, he thought they had also attempted to coerce the employers in the selection of their representatives for the purpose of adjusting grievances in violation of 8(b)(1)(B) to be considered hereinafter.
 
 The Jurisdiction Clause
 
 7
 The Board neither agreed nor disagreed with the trial examiner's conclusion that the unions had violated 8(b)(2) by striking for the inclusion of the jurisdiction clause in future collective baragaining agreements. It said in a footnote to its decision that while it agreed with the trial examiner that the unions had violated 8(b)(2) by striking to force the employers to accede to the unions' demands for the illegal foreman and general laws clauses, it found it 'unnecessary to pass upon his finding that the Respondents violated Section 8(b)(2) by so striking also for the jurisdiction clause.' Our consideration of this clause is, therefore, narrowed to the question whether by insisting upon its inclusion in the future contracts the unions refused to bargain collectively in violation of 8(b)(3).
 
 
 8
 There is no dispute that in both cases the jurisdiction clauses on which the unions insisted covered not only work which the unions and the employers had regarded in the past as composing room work, but also a number of job processes and operations which the employers had not and did not contemplate installing in their plants.[8] In the case of Worcester it also covered, as previously noted, paste-makeup work which for years had been done by artists who did not work in the composing room and who had never been included in the composing room bargaining unit.[9]
 
 
 9
 Both employers had for years recognized their composing room employees as forming appropriate units for collective bargaining purposes, but there had never been a Board determination to that effect. Nevertheless, the trial examiner, the Board concurring, had no difficulty in finding that the composing room employees of the employers in the classifications covered by the past agreements between the unions and the employers, subject to the statutory exclusion of foremen, constituted appropriate units for the purpose of collective bargaining within the meaning of 9(a) of the Act. And it was similarly found that the respective unions represented a majority of the employees in those units. But, noting that in general the Board in the past had refused to include nonexistent or future job operations in the units it considered appropriate for the purposes of collective bargaining, it was determined by the trial examiner, the Board affirming, that units including non-existent or future job operations upon which the unions insisted in their negotiations for future contracts were inappropriate. Hence it was determined that by insisting upon bargaining only for inappropriate units the unions had not fulfilled their obligation to bargain as required by 8(b)(3) of the Act.
 
 
 10
 The Board's power to determine the units appropriate for collective bargaining is broad. 'The issue as to what unit is appropriate for bargaining is one for which no absolute rule of law is laid down by statute, and none should be by decision. It involves of necessity a large measure of informed discretion, and the decision of the Board, if not final, is rarely to be disturbed.' Packard Motor Car Co. v. National Labor Relations Board, 1947,330 U.S. 485, 491, 67 S.Ct. 789, 793, 91 L.Ed. 1040.
 
 
 11
 The unit on which the unions insisted is not a positively illegal unit, as for instance one including supervisory employees. Moreover, we cannot doubt that in a proper proceeding the Board in the exercise of its broad power could either include or exclude future or non-existent existent job operations from the unit it determined appropriate for collective bargaining purposes. Thus this is not a case in which the unions are pressing for an obviously inappropriate unit. It may very well be sound policy for the Board not to include non-existent or future job classifications in the units it determines appropriate for collective bargaining purposes. It may be wiser to wait for the benefit of experience with new processes and operations rather than to attempt to anticipate the skills that may be required to carry them out. Moreover, inclusion of future or nonexistent job operations in a bargaining unit sets the stage for future proceedings under 10(k) of the Act to settle jurisdictional disputes. Although the Board may think the unit on which the unions insisted inappropriate, it was not illegal, for a unit including future or non-existent jobs in neither unlawful per se nor obviously and clearly inappropriate.
 
 
 12
 The question is whether by insisting on the broader unit the unions in effect were refusing to bargain collectively with the employers. To paraphrase what this court said in N.L.R.B. v. Reed & Prince Mfg. Co., 1 Cir., 1953,205 F.2d 131, 134, the question is whether it is to be inferred from the totality of the unions' conduct that they went through the motions of negotiation as an elaborate pretense with no sincere desire to reach an agreement if possible, or that they bargained in good faith but were unable to arrive at an acceptable agreement with the employers. This question, however, the Board itself answered when it adopted the trial examiner's finding that the unions were desirous of securing contracts with the employers. It may be that the unions were uncompromising in their jurisdictional demands, but under 8(d) of the Act quoted in footnote 12, infra, the obligation to bargain collectively 'in good faith' does not compel either party to agree to a proposal or require the making of a concession. See National Labor Relations Board v. American National Insurance Company, 1952, 343 U.S. 395, 72 S.Ct. 824, 829, 96 L.Ed. 1027. Although the unions may have insisted rather stubbornly in their demand for the jurisdiction clause, we have little difficulty, in view of the finding that they sincerely desired contracts, in concluding that the unions by their insistence on the clause did not refuse to bargain collectively as required by 8(b)(3) of the Act.
 
 
 13
 The Foreman Clause.
 
 
 14
 This clause as proposed and insisted upon by the unions provides: 'The hiring, operation, authority and control of each composing room shall be vested exclusively in the office through its representative, the foreman, who shall be a member of the Union. In the absence of the foreman, the foreman-in-charge shall so function.
 
 
 15
 'All orders, instruction, reprimands, etc., must be given through the foreman who shall have the right to assign men to any composing room work he deems necessary.'[10]
 
 
 16
 The trial examiner and the Board found that by insisting upon this clause the unions refused to bargain in good faith and that by striking in support of their insistence upon the clause the unions had undertaken to restrain or coerce the employers in the selection of their representatives for the adjustment of grievances in violation of 8(b)(1)(B) of the Act.[11] The reasoning by trial examiner and the Board reached this conclusion is fragmentary and far from clear. Indeed, the trial examiner's intermediate rport, which the Board affirmed, consists of a lengthy recapitalation of the evidence interspersed here an there with a finding of fact followed by lengthy conclusions summarized in brief paragraphs. This technique of decision has not only rendered our consideration of this case exceedingly difficult and needlessly time consuming but has also served better to conceal than to disclose the Board's reasoning. Nevertheless, we agree with the Board's conclusions with respect to the foreman clause.
 
 
 17
 There can be no doubt that the foreman's duties necessarily included participation in the adjustment of employee grievances. Hance, by insiting that the foremen must be union members, the unions were restraining and coercing the employers in the selection of their representatives for grievance adjustment purposes. Not only would the clause as proposed by the unions limit the employers' choice of foremen to union members, but it would also give the unions power to force the discharge or demotion of a foreman by expelling him from the union.
 
 
 18
 It seems to us equally clear, however, that by insisting on the foreman clause as they wanted it, the unions violated 8(b)(2) of the Act quoted in material part in footnote 7, supra, for the effect of the clause would be to cause the employers to discriminate in favor of union men in appointing their foremen thereby encouraging aspirants for that position to join the union. And 8(b)(2) covers all situations in which the union seeks to cause the employer to accept conditions under which any non-union employee or job applicant will be unlawfully discriminated against. N.L.R.B. v. National Maritime Union, 2 Cir., 1949, 175 F.2d 686, 689. Thus we believe that by striking for the foreman clause the unions violated 8(b)(2) of the Act as well as 8(b)(1)(B).
 
 
 19
 And we think that in holding out for the clause the unions also refused to bargain collectively in violation of 8(b)(3). There may be cases in which uncompromising insistence upon a legal contract clause is so utterly unreasonable under the circumstances as to warrant an inference of bad faith. The problem is to reconcile the duty to 'confer' in 'good faith' imposed by 8(d) of the Act[12] that is to say with the sincere and honest desire to reach an agreement if possible, and the right conferred in that section, perhaps even stubbornly, to refuse to agree to a proposal or to make a concession with respect to a contract clause. However, to hold that good faith is a defense to the charge of refusal to bargain when the contract provision insisted upon is illegal per se is to put a premium on ignorance of the law or blind intransigency. Thus, as to this clause, the unions are not saved by the finding that they negotiated with the genuine desire to arrive at a contract.
 
 
 20
 It is true that in the Haverhill case the foreman clause was not a key issue. And it is also true that after the strikes the unions withdrew their demands for the clause. But there is no assurance that their demands for inclusion of the clause will not be renewed. Since bargaining demands for, and a strike aimed at forcing an emploer to accede to, the inclusion of an obviously illegal provision in a collective bargaining contract justify enforcement of a case and desist order, see N.L.R.B. v. National Maritime Union, 2 Cir., 1949, 175 F.2d 686, 689, we think the Board is entitled to enforcement of its order so far as this clause is concerned.
 
 
 21
 The General Laws Clause.
 
 
 22
 There can be no doubt, indeed it is not seriously disputed, that several of the provisions of ITU general laws, if literally applied, would import illegal union security provisions into any collective bargaining agreement into which they might be incorporated. The question is whether the 'not in conflict with law' provision, and the provision that the contract alone shall govern relations between the parties as to all matters concerning which it makes any provision, of the proposed contract clause with respect to the inclusion of the ITU general laws serves to immunize the proposed contract from the illegality of many of the general laws of ITU.
 
 
 23
 The provision that contract terms alone shall govern with respect to all matters as to which it makes any provision does not call for extended consideration, for it is clear that the local unions would not, and indeed could not, under ITU rules and regulations, enter into any collective bargaining agreement without ITU approval, and ITU's insistence that 'Union language must be taken' with respect to its general laws demonstrates that ITU would not approve any contract provision substantially in conflict with its laws. The 'not in conflict with law' provision or savings clause, as it is sometimes referred to, requires more lengthy discussion.[13]
 
 
 24
 The United States Court of Appeals for the Second Circuit has answered in the negative the question of the immunizing effect of a not in conflict with law provision comparable to the one in the case at bar. In Red Star Express Lines v. N.L.R.B., 2 Cir., 1952, 196 F.2d 78, 81, that court, per Judge A. N. Hand, Judge L. Hand dissenting, took the view that the question was not merely whether under principles of contract law a 'savings clause' addendum to a contract containing an illegal union security clause would contractually negative that clause. It took the view that the question was more whether the savings clause would have the effect of preventing the coercion which would otherwise follow from inclusion of the illegal clause in the contract.[14] As to the effect of the savings clause, the court accorded weight to the view of the Board. It noted that entering into a contract containing an illegal union security clause would constitute an unfair labor practice because the existence of such an agreement without more (whether enforced or not), would tend to encourage union membership. The court then said that the Act required that employees should be free to choose between joining and refusing to join a union and forbad any form of interference with that choice, and from this concluded that a contract containing an illegal union security clause, even though modified by an addendum in the form of a provision excluding whatever contract clauses might be illegal, would not eliminate the coercive effect of the contract. 'For,' the court said, 'the question is not only whether under principles of contract law the addendum would contractually negative the illegal union security clauses, but whether it would have the effect of preventing the coercion that would otherwise follow' from the inclusion of such clauses in the body of the contract. The court then said: 'The Board found it would not have such an effect 'because it fails to specify which, if any, clauses were to be suspended.' In our opinion the Board was entitled to adopt this view as a matter of sound policy and reasonable interpretation. The vague language of the adeendum would not help the ordinary employee to understand that the union security clause was no longer binding.' As explained in N.L.R.B. v. Gaynor News Co., 2 Cir., 1952, 197 F.2d 719, 723, 724, the court's reasoning in the Red Star Express Lines case was 'that an employee cannot be expected to predict the validity or invalidity of particular clauses in the contract, and will feel compelled to join the union where a union-security clause of questionable validity exists, if only as a hedging device against a possible future upholding of the clause.' In accord see N.L.R.B. v. Gottfried Baking Co., 2 Cir., 1954, 210 F.2d 772, 780.
 
 
 25
 The question is not free from doubt. Nevertheless, in spite of perhaps some inferences to the contrary to be drawn from Honolulu Star-Bulletin, Ltd. v. N.L.R.B., D.C.Cir.1959, 274 F.2d 567, we agree with both the reasoning and the result of the cases from the Court of Appeals for the Second Circuit cited above.
 
 
 26
 The question now arises whether a union is to be found guilty of unfair labor practices when it bargains for and strikes to coerce an employer to consent to the inclusion in a collective bargaining agreement of clauses of honestly disputable validity at the time of the union action. We think this question must be answered in the affirmative.
 
 
 27
 It is true that the legality or illegality of the unions' conduct at the bargaining conferences and in calling the strikes, so far as the General Laws clause is concerned, can only be determined by subsequent action by the Board followed by proceedings in a court of appeals or perhaps in the Supreme Court of the United States. But, as this court pointed out in a comparable situation in N.L.R.B. v. Local 404, etc., 1 Cir., 1953, 205 F.2d 99, 102, 103, 'this in itself presents no unique situation.' The point in that case as in this is simply that the unions were acting at their peril, that is to say, at the risk of an enforcement order, when they sought to compel the employers to submit to their demand for inclusion of the ITU general laws in the collective bargaining contracts under negotiation.
 
 
 28
 ITU's contention that it is not a proper party to this proceeding, and so that the Board erred in finding that it had committed any unfair labor practices, deserves only brief consideration. There can be no doubt whatever that officers of ITU actively participated with officers of the local unions in negotiating for contracts with both Haverhill and Worcester. Nor can there by any doubt that under ITU rules and regulations any contracts negotiated by the local unions had to be submitted to and approved by an agency of ITU. Furthermore, the evidence is clear that in both cases the strikes were sanctioned and approved by high officers of ITU. We think it clear that under these circumstances ITU, and in the Worcester case its Executive Council, were proper parties to this proceeding and were properly chargeable with the unfair labor practices found to have been committed by the locals. See American Newspaper Publishers Ass'n v. N.L.R.B., 7 Cir., 1951, 193 F.2d 782, 804, 805, certiorari denied on this point 1951, 344 U.S. 812, 73 S.Ct. 10, 97 L.Ed. 632.
 
 
 29
 The order entered by the Board, in effect, requires both respondents to cease and desist from engaging in action with respect to Haverhill and Worcester that would violate sections 8(b)(1)(B), 8(b)(2), and 8(b)(3) of the Act in any manner. See Communications Workers etc. et al. v. N.L.R.B., 1960,80 S.Ct. 838. We consider this order to be excessively broad. It is true that this court upheld an order forbidding a union to engage in certain conduct with respect to any other employer. N.L.R.B. v. Springfield Building & Const. Trades Council, 1 Cir., 1958, 262 F.2d 494. In that case, however, the unions were told what the proscribed conduct was. As the Board's order now stands any alleged violation of the aforementioned sections would be tried in this court in the first instance in contempt proceeding, no matter how unrelated it may be to the earlier illegal activity engaged in by the union. And, 'the authority conferred on the Board to restrain the practice which it has found the employer (union) to have committed is not an authority to restrain generally all other unlawful practices which it has neither found to have been pursued nor persuasively to be related to the proven unlawful conduct.' National Labor Relations Board v. Express Publishing Co., 1941, 312 U.S. 426, 433, 61 S.Ct. 693, 698, 85 L.Ed. 930. Accordingly, we restrict the Board's order to the specific practices found to be unlawful, or practices persuasively related thereto.
 
 
 30
 A decree will be entered enforcing the Order of the Board as modified in accordance with this opinion.
 
 
 
 [1]
 Included in the complaint issued on Worcester's charge are also the Executive Council of ITU and the Scale Committee of Local 165
 
 
 [2]
 During the negotiations Worcester and Haverhill with the approval of the unions voluntarily granted their composing room employees an increase in wages
 
 
 [3]
 Haverhill did not consider the foreman clause a 'key' issue
 
 
 [4]
 The new jurisdiction clause covered 'paste-makeup' operations which at Worcester's plant had for many years been performed by artists who did not work in the composing room and had never been represented by Local 165. And it covered an operation or process involving the use of tape which Haverhill was using only experimentally
 
 
 [5]
 The employers did not object to a union man being foreman. Indeed their foremen were union men. Their objection was to the requirement that their foreman had to be members of the union
 
 
 [6]
 'It shall be an unfair labor practice for a labor organization or its agents--
 '(3) to refuse to bargain collectively with an employer, provided it is the representative of his employees subject to the provisions of section 9(a) of this title; * * *.'
 
 
 [7]
 'It shall be an unfair labor practice for a labor organization or its agents--
 '(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3) * * *,' which in pertinent part provides:
 'It shall be an unfair labor practice for an employer--
 '(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: * * *.'
 
 
 [8]
 Worcester offered to include a clause in the new contract to the effect that it would not introduce certain new processes during the life of the contract but the unions rejected the offer
 
 
 [9]
 In the 10(k) proceeding referred to earlier in this opinion the Board held that Local 165 and its agents were not lawfully entitled to force or require Worcester to assign paste-makeup work to a member of the union rather than to an employee of its own choice
 
 
 [10]
 In the Worcester case the clause contained the further provision:
 'The Union shall not discipline the foreman for carrying out written instructions of the publisher or his representatives authorized by this Agreement.'
 
 
 [11]
 'It shall be an unfair labor practice for a labor organization or its agents--
 '(1) to restrain or coerce * * * (B) an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances; * * *.'
 
 
 [12]
 'For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession; * * *.'
 
 
 [13]
 The unions insist that in this case the clause should be called an 'exclusionary clause.' We see no significant difference in the terminology to be employed. We are not deciding this case on an issue of semantics
 
 
 [14]
 We perceive no reason why the coercive effect of the illegal clauses would be lessened if, as in this case, they are incorporated by reference into the contract, rather than written into the contract itself